Deutsche Bank Natl. Trust Co. v Flagstar Capital Mkts. (2018 NY Slip Op 06851)

Deutsche Bank Natl. Trust Co. v Flagstar Capital Mkts.

2018 NY Slip Op 06851 [32 NY3d 139]

October 16, 2018

Fahey, J.

Court of Appeals

Published by New York State Law Reporting Bureau pursuant to Judiciary Law § 431.

As corrected through Wednesday, December 26, 2018

[*1]

Deutsche Bank National Trust Company, Solely in its Capacity as Trustee for the Harborview Mortgage Loan Trust Series 2007-7, Appellant,
v
Flagstar Capital Markets Corporation, Defendant, and Quicken Loans, Inc., Respondent.

Argued September 6, 2018; decided October 16, 2018

Deutsche Bank Natl. Trust Co. v Flagstar Capital Mkts. Corp., 143 AD3d 15, affirmed.

{**32 NY3d at 143} OPINION OF THE COURT

Fahey, J.

This case steps into an area of subtle interplay that exists between the freedom to contract and New York public policy. In ACE Sec. Corp., Home Equity Loan Trust, Series 2006-SL2 v DB Structured Prods., Inc. (25 NY3d 581 [2015] [hereinafter ACE]), we held that a cause of action for breach of representations and warranties contained within a residential mortgage-backed securities contract accrued when the contract was executed because the representations and warranties were breached "if at all, on that date" (id. at 589). On this appeal, plaintiff contends that contractual language different from the language at issue in ACE either created a substantive condition precedent to suit or represented the clear intent of the parties to postpone commencement of the statutory limitations period until certain specified events had occurred. We conclude that no substantive condition precedent was created, and that to the extent the parties otherwise intended to delay the commencement of the limitations period, their attempt to do so was inconsistent with New York law and public policy. The lower courts therefore correctly concluded that plaintiff's action was untimely.
I.
[*2]
Defendant Quicken Loans, Inc. was the originator of certain mortgage loans that it sold to nonparty Morgan Stanley Mortgage Capital, Inc. pursuant to a contract entitled "Second Amended and Restated Mortgage Loan Purchase and Warranties Agreement" (MLPWA), dated June 1, 2006. Pursuant to a series of subsequent agreements, the loans were eventually sold to the HarborView Mortgage Loan Trust 2007-7 (the Trust) for the purpose of issuing residential mortgage-backed securities. Plaintiff Deutsche Bank National Trust Company serves as trustee of the Trust. It is undisputed that defendant's obligations and the rights of Morgan Stanley Mortgage Capital, Inc. under the MLPWA are enforceable by plaintiff as trustee on behalf of the Trust.
In sections 9.01 and 9.02 of the MLPWA, defendant made a series of representations and warranties concerning itself, the{**32 NY3d at 144} transaction, and the characteristics and quality of the mortgage loans it was conveying. The representations and warranties concerning the individual mortgage loans were made "as of the related Closing Date for such Mortgage Loan." The parties agree that the loans were sold in groups, and that the closing date for each group of loans occurred between December 7, 2006 and May 31, 2007. The MLPWA also contained a "sole remedy" provision, which provided that in the event of a breach of the representations and warranties, the purchaser's sole remedy was defendant's obligation to cure or repurchase a non-conforming loan.
In 2013, a certificateholder engaged an underwriting firm to review a sample of the mortgage loans and determine whether they complied with defendant's representations and warranties. According to the complaint, many of the loans reviewed did not conform to the representations and warranties, such as those concerning borrower income, debt-to-income ratios, and occupancy status.
Plaintiff commenced this action against defendant on August 30, 2013, by filing a summons with notice.[FN1] Plaintiff's complaint was filed on February 3, 2014. As relevant here, plaintiff alleged that defendant breached the MLPWA by selling defective mortgage loans that did not comply with the representations and warranties. Defendant subsequently moved to dismiss the complaint, arguing, inter alia, that plaintiff's action was time-barred by the six-year statute of limitations applicable to breach of contract actions because it was commenced more than six years after the closing date for the sale of each package of mortgage loans, the most recent of which occurred on May 31, 2007 (see CPLR 213 [2]).
In opposition to the motion, plaintiff did not dispute that the representations and warranties made by defendant in the MLPWA were effective as of the closing date. Instead, plaintiff argued that the statute of limitations had yet to lapse, relying upon a provision in the MLPWA that it refers to as the "accrual clause," which states as follows:
"Any cause of action against the Seller relating to or arising out of the breach of any representations and warranties made in Subsections 9.01 and 9.02{**32 NY3d at 145} shall accrue as to any Mortgage Loan upon (i) discovery of such breach by the Purchaser or notice thereof by the Seller to the Purchaser, (ii) failure by the Seller to cure such breach, substitute a Qualified Substitute Mortgage Loan or repurchase such Mortgage Loan as specified above and (iii) demand upon the Seller by the Purchaser for compliance with this Agreement."
Supreme Court, among other things, granted defendant's motion to dismiss the breach of contract claim as untimely (2015 NY Slip Op 31787[U] [Sup Ct, NY County 2015]). The court held that any breach of defendant's representations and warranties concerning the individual mortgage loans occurred on the closing date of the loans, no later than May 31, 2007, and therefore plaintiff's breach of contract cause of action accrued no later than that date. The court further concluded that the accrual clause could not serve to extend the statute of limitations.[FN2]
On appeal, the Appellate Division affirmed insofar as appealed from (143 AD3d 15 [1st Dept 2016]). Relying on our decision in ACE, the Court held that the accrual clause did not create a substantive condition precedent or constitute a promise of future performance (see id. at 20-22). The Appellate Division further concluded that to the extent the parties intended for the accrual clause to delay accrual of the breach of contract cause of action, the accrual clause was unenforceable because it violates New York public policy (see id. at 20).
The Appellate Division granted plaintiff leave to appeal to this Court (2016 NY Slip Op 96056[U] [2016]). We now affirm.
II.
In New York, the default accrual rule for breach of contract causes of action is that the cause of action accrues when the contract is breached (see ACE, 25 NY3d at 593-594, citing Ely-Cruikshank Co. v Bank of Montreal, 81 NY2d 399, 403-404 [1993]). "[E]xcept in cases of fraud where the statute expressly provides otherwise, the statutory period of limitations begins to run from the time when liability for wrong has arisen even though the injured party may be ignorant of the existence of the wrong or injury" (Ely-Cruikshank Co., 81 NY2d at 403 {**32 NY3d at 146}[internal quotation marks omitted]). This Court has "repeatedly rejected accrual dates which cannot be ascertained with any degree of certainty, in favor of a bright line approach," and for that reason, we do not "apply the discovery rule to statutes of limitations in contract actions" (ACE, 25 NY3d at 593-594 [internal quotation marks omitted]). "To extend the highly exceptional discovery notion to general breach of contract actions would effectively eviscerate the Statute of Limitations in this commercial dispute arena" (Ely-Cruikshank Co., 81 NY2d at 404).
We applied these rules in ACE to reject the plaintiff's contention that its breach of contract claims, which were also based on a breach of the representations and warranties in a residential mortgage-backed securities contract, did not accrue until the defendant failed to cure or repurchase the non-conforming loans. We concluded that the cure or repurchase protocol did not constitute a "separate promise of future performance" that could be breached at some later date because the cure or repurchase protocol was merely "the Trust's remedy for a breach of [the] representations and warranties, not a promise of the loans' future performance" (ACE, 25 NY3d at 594-595). We reasoned that
"[i]f the cure or repurchase obligation did not exist, the Trust's only recourse would have been to bring an action against [the defendant] for breach of the representations and warranties. That action could only have been brought within six years of the date of contract execution. The cure or repurchase obligation is an alternative remedy, or recourse, for the Trust, but the underlying act the Trust complains of is the same: the quality of the loans and their conformity with the representations and warranties" (id. at 596).
We further rejected the plaintiff's argument that the cure or repurchase obligation "was a substantive condition precedent to suit that delayed accrual of the cause of action," observing that the plaintiff had "ignore[d] the difference between a demand that is a condition to a party's performance, and a demand that seeks a remedy for a preexisting wrong" (id. at 597). We explained that the defendant "breached the representations and warranties in the parties' agreement, if at all, the moment the [relevant contract] was executed," and therefore "[t]he Trust suffered a legal wrong at [that] moment" {**32 NY3d at 147}(id. at 597-598). At that moment, "a cause of action existed for breach of a representation and warranty; the Trust was just limited in its remedies for that breach," and "[h]ence, the condition was a procedural prerequisite to suit" (id. at 598).
If ACE is controlling here, plaintiff's cause of action based on a breach of the representations and warranties would have accrued on the "Closing Date" of the loans, i.e., the date that the representations and warranties concerning the underlying mortgage loans became effective. The six-year statutory limitations period therefore would begin to run, at the latest, on May 31, 2007, the closing date for the last group of loans. Plaintiff contends, however, that ACE does not control because the contract at issue in ACE did not contain an "accrual clause," which makes the present case distinguishable from ACE in two ways. First, plaintiff asserts that the accrual clause created a substantive condition precedent to suit. Second, plaintiff argues that the accrual clause expresses the clear intent of [*3]the parties to delay accrual of a breach of contract cause of action until the specified events had occurred, and that this Court should honor the intent of the parties, consistent with our public policy supporting freedom to contract. We address each argument in turn.
III.
Plaintiff does not dispute that, absent the language of the accrual clause, a breach of contract cause of action based on a breach of the representations and warranties would have accrued at the moment those representations and warranties were violated, i.e., on the closing date of the loans. Plaintiff contends, however, that because the accrual clause states that a cause of action against defendant arising from a breach of the representations and warranties "shall accrue" when, among other things, a demand upon defendant for compliance with the MLPWA is made, the demand is therefore by definition "part of the cause of action" (ACE, 25 NY3d at 597 [internal quotation marks omitted]), and the accrual clause created a substantive condition precedent. Plaintiff argues that defendant "therefore does not breach the contract, and no cause of action exists, unless [defendant] has an opportunity to investigate the loans and refuses to cure or repurchase them." In other words, plaintiff asserts that by using the phrase "shall accrue," the parties defined a breach of the contract not as the falsity of the representations and warranties alone, but as defendant's failure to cure or repurchase non-conforming loans after{**32 NY3d at 148} discovery or notice of the falsity and after plaintiff demands defendant's compliance with the MLPWA.
[1] We disagree with plaintiff's position that by using the phrase "shall accrue," the parties intended to define a breach of contract as defendant's failure to comply with the remedial provisions after discovery or notice of a violation of the representations and warranties and plaintiff's demand for compliance. Indeed, the accrual clause states that "[a]ny cause of action against the Seller relating to or arising out of the breach of any representations and warranties . . . shall accrue as to any Mortgage Loan upon" the events specified (emphasis added). The accrual clause itself refers to a "breach" of the representations and warranties, and the contract nowhere suggests that defendant's transfer of loans that do not comply with the representations and warranties is not a "breach" of the MLPWA. Rather, the MLPWA states that defendant's obligations to cure or repurchase a defective mortgage loan constitute plaintiff's "sole remedies" for "a breach of the foregoing representations and warranties." Thus, according to the MLPWA—including the accrual clause—the failure of the loans to comply with the representations and warranties on the date of transfer is a breach of the MLPWA, and defendant's obligation to cure or repurchase defective loans constitutes plaintiff's sole remedy for such a breach.
Plaintiff's argument that the accrual clause creates a substantive condition precedent therefore fails for the same reason as in ACE: plaintiff "ignores the difference between a demand that is a condition to a party's performance, and a demand that seeks a remedy for a preexisting wrong" (ACE, 25 NY3d at 597). Pursuant to the MLPWA, the relevant "performance" here is defendant's transfer of loans that complied with the representations and warranties in the MLPWA. As in ACE, the cure or repurchase protocol merely sets forth the remedy for a breach of the representations and warranties (see ACE, 25 NY3d at 597-598).
The accrual clause does not create a substantive condition precedent because no provision of the accrual clause creates a condition to defendant's performance under the contract: delivery of mortgage loans that comply with the representations and warranties. Defendant was obligated to deliver loans that complied with the representations and warranties at the moment the MLPWA was executed. Defendant therefore breached the representations and warranties, "if at all," on the {**32 NY3d at 149}closing date for each group of loans, because the representations and warranties with respect to each loan were either true or false on that date (ACE, 25 NY3d at 598). Nothing in the accrual clause created a condition to defendant's obligation to comply with the representations and warranties, and therefore nothing in the accrual clause created a substantive condition precedent to the relevant performance that plaintiff alleges was breached (see ACE, 25 NY3d at 597-598).
For these reasons, plaintiff's reliance on John J. Kassner & Co. v City of New York (46 NY2d 544 [1979]) is misplaced. In Kassner, the plaintiff was an engineering firm that entered into a contract with the City of New York for relocation of utility facilities (see id. at 547). The contract provided that the plaintiff would be paid "in percentage installments as the work progressed 'subject to audit and revision by the Comptroller' of the city" (id. at 547-548). The plaintiff's request for payment on the final installment was for the most part disallowed by the comptroller after [*4]its audit, and the results of that audit were communicated to the plaintiff no later than July 1968 (see id. at 548). This Court held that the plaintiff's cause of action for breach of contract based on the city's failure to make the final payment accrued no later than July 1968 because "the plaintiff's right to final payment and the city's obligation to pay were conditioned upon completion of the audit" (id. at 550).
Stated another way, the Kassner Court reasoned that the city had no obligation to pay, and the plaintiff therefore had no cause of action for breach of contract for failure to pay, until the comptroller's audit was complete (see id.). Audit by the comptroller was therefore a condition to the city's performance and constituted a substantive condition precedent. The plaintiff's cause of action for breach of contract "accrue[d] only when the condition ha[d] been fulfilled" (id.). Here, by contrast, nothing in the accrual clause created a condition to defendant's obligation to deliver loans that complied with the representations and warranties (see Deutsche Bank Natl. Trust Co. v Quicken Loans Inc., 810 F3d 861, 866-867 [2d Cir 2015]; see also Hahn Automotive Warehouse, Inc. v American Zurich Ins. Co., 18 NY3d 765, 770-772 [2012]).
This conclusion does not end our inquiry. A substantive condition precedent impacts accrual of a breach of contract cause of action because no obligation to perform arises and no breach therefore occurs until the "condition has been fulfilled" (Kassner, 46 NY2d at 550; see ACE, 25 NY3d at 597-598). It is possible,{**32 NY3d at 150} however, that the language in the accrual clause expressed the contracting parties' intent to delay commencement of the limitations period notwithstanding that the clause does not create a substantive condition precedent. We therefore must examine whether the parties may postpone accrual in this way consistent with New York law and public policy.
IV.
Initially, defendant contends that despite the "shall accrue" language in the accrual clause, the contracting parties did not intend to delay accrual of a breach of contract cause of action arising from a breach of the representations and warranties. Rather, defendant asserts that the parties merely intended to create procedural conditions precedent to suit. Defendant contends that the breach of contract cause of action for breach of the representations and warranties accrued on the closing date of the loans, and the limitations period therefore began to run on that date, but that before plaintiff could commence suit for that breach, (i) plaintiff must discover the breach or defendant must provide notice of the breach; (ii) defendant must fail to cure or repurchase; and (iii) plaintiff must demand defendant's compliance with the MLPWA. According to defendant, the accrual clause merely sets forth the protocol for plaintiff's "remedy for a preexisting wrong" (ACE, 25 NY3d at 597).
Plaintiff, by contrast, contends that the accrual clause manifests the clear intent of the parties that a cause of action for a breach of the representations and warranties "comes into existence (accrues)—only after the conditions of the Accrual Clause are complete," meaning that the statute of limitations is not triggered until that time. We need not resolve this dispute regarding the meaning of the accrual clause, however, because assuming for the sake of argument that plaintiff's alternative interpretation is correct, the accrual clause cannot be enforced in that manner because it conflicts with New York law and public policy.
In Kassner, a different provision of the parties' contract provided that " '[n]o action shall be . . . maintained against the City upon any claim based upon this contract or arising out of this contract . . . unless such action shall be commenced within six (6) months after the date of filing in the office of the Comptroller of the City of the certificate for the final payment hereunder,' " and that " '[n]one of the provisions of Article 2 of the Civil Practice Laws and Rules shall apply to any action{**32 NY3d at 151} against the City arising out of this contract' " (Kassner, 46 NY2d at 548). As discussed above, the plaintiff learned of the results of the comptroller's audit no later than July 1968, and this Court held that the plaintiff had the right to final payment as of that date (see id. at 548-550). The certificate of final payment, however, was not filed in the comptroller's office until November 1974, after the plaintiff had collected the amount of the final payment that was undisputed (see id. at 548). The plaintiff argued that its action for payment of the disputed amount, commenced in April 1975, was timely because the contract expressly allowed the plaintiff to file suit within six months of the filing of the certificate of final payment (see id. at 548-549). In other words, the plaintiff contended that its breach of contract cause of action "did not accrue until the certificate of final payment had been filed" (id. at 549).
[*5]
Supreme Court and the Appellate Division accepted the plaintiff's argument, but this Court reversed (see id.). The Court observed that the statute of limitations is not only a personal defense but also "expresses a societal interest or public policy 'of giving repose to human affairs' " (id. at 550, quoting Flanagan v Mount Eden Gen. Hosp., 24 NY2d 427, 429 [1969]). Although contracting parties may therefore agree to a shorter limitations period, public policy restricts their ability to make an agreement extending the statutory period before a claim accrues (see id. at 550-551). We explained that "[i]f the agreement to waive or extend the Statute of Limitations is made at the inception of liability it is unenforceable because a party cannot[,] in advance, make a valid promise that a statute founded in public policy shall be inoperative" (id. at 551 [internal quotation marks omitted]). Furthermore, if the agreement to extend the statute of limitations "is made after the cause of action has accrued," it is enforceable only if it complies with the requirements of General Obligations Law § 17-103, which not only mandates that the agreement be made after the cause of action has accrued, but also allows renewal of the statute of limitations only "for the applicable period, unless a shorter period is specified" (Kassner, 46 NY2d at 551).
The Court acknowledged that the contract provision stating that the suit must be commenced within six months of the filing of the certificate of final payment likely was included to "shorten the Statute of Limitations," not lengthen it (id. at 552). Nevertheless, the Court held that to the extent the plaintiff sought to use the provision to postpone accrual of the{**32 NY3d at 152} cause of action, "since it was adopted at the inception of the contract and not after the cause of action had accrued, it may not serve to extend the Statute of Limitations" (id.).
Kassner is controlling here. As in Kassner, absent the language of the accrual clause insofar as plaintiff interprets it, the breach of contract cause of action would have accrued, and the limitations period would have started to run, at an earlier date. Like the plaintiff in Kassner, plaintiff here argues that certain contract language delayed accrual of the breach of contract cause of action for statute of limitations purposes to a later date, until specified events chosen by the parties have occurred. If, as plaintiff suggests, that was the intent of the parties, the accrual clause "may not serve to extend the Statute of Limitations" in this manner (id.).
[2] Plaintiff asserts that the accrual clause is valid because it does not "extend" the statute of limitations, inasmuch as the statutory period remains at six years from the contractually-chosen accrual date and no more. That assertion cannot be reconciled with our holding in Kassner. The plaintiff there argued that the accrual date was postponed until the specified event—there, filing of the certificate of final payment—had occurred (id. at 549). This Court framed the issue as whether "a contractual limitations clause, which begins to run at a later date than the time of accrual under the statute, [can] effectively extend the Statute of Limitations in an action on the contract" (id. at 549-550). The Kassner Court unequivocally held that it could not, explaining that " '[t]he public policy represented by the statute of limitations becomes pertinent where the contract not to plead the statute is in form or effect a contract to extend the period as provided by statute or to postpone the time from which the period of limitation is to be computed' " (id. at 551, quoting 1961 Rep of NY Law Rev Commn at 97-98, reprinted in 1961 McKinney's Session Laws of NY at 1871).
Plaintiff further contends that its interpretation of the accrual clause does not violate General Obligations Law § 17-103 because that statute does not expressly prohibit contract provisions defining an accrual date. We disagree. General Obligations Law § 17-103 (1) provides:
"A promise to waive, to extend, or not to plead the statute of limitation applicable to an action arising out of a contract express or implied in fact or in law, if made after the accrual of the cause of action{**32 NY3d at 153} and made, either with or without consideration, in a writing signed by the promisor or his agent is effective, according to its terms, to prevent interposition of the defense of the statute of limitation in an action or proceeding commenced within the time that would be applicable if the cause of action had arisen at the date of the promise, or within such shorter time as may be provided in the promise."
Stated another way, the statute requires an agreement to extend the statute of limitations to be made "after the accrual of the cause of action," and it allows extension of the limitations period only for, at most, the time period that would [*6]apply if the cause of action had accrued on the date of the agreement, i.e., six years from the date that the agreement was made if the limitations period is six years (id.; see Bayridge Air Rights v Blitman Constr. Corp., 80 NY2d 777, 779-780 [1992]). An agreement to extend the statute of limitations that does not comply with these requirements "has no effect" (General Obligations Law § 17-103 [3]). In addition, CPLR 201 provides that an action "must be commenced within the time specified in this article unless a different time is prescribed by law or a shorter time is prescribed by written agreement," and "[n]o court shall extend the time limited by law for the commencement of an action."
Absent the language of the accrual clause, a cause of action based on a breach of the representations and warranties would have been time-barred after May 31, 2013, six years from the last date that the representations and warranties could have been violated. The accrual clause therefore contravenes General Obligations Law § 17-103 in two ways, if the clause is interpreted as plaintiff suggests: (1) it is an agreement to effectively extend the limitations period that was made before a breach of contract cause of action had accrued; and (2) it would extend the limitations period to a future date uncertain, inasmuch as plaintiff's discovery of the breach or defendant's notice of the breach might occur decades into the future, for the life of the mortgage loans (see Bayridge, 80 NY2d at 779-780). The public policy represented by the statute of limitations, CPLR 201, and General Obligations Law § 17-103 would be effectively abolished if contracting parties could circumvent it by "postpon[ing] the time from which the period of limitation is to be computed" (Kassner, 46 NY2d at 551 [emphasis and internal quotation marks omitted]; see also Rep of Law Rev Commn, 1961 McKinney's Session Laws of NY at 1871 [proposing{**32 NY3d at 154} the legislation that would become General Obligations Law § 17-103]).
V.
Plaintiff is correct that freedom to contract is an important public policy in New York, and it undoubtedly remains so after this decision (see 2138747 Ontario, Inc. v Samsung C&T Corp., 31 NY3d 372, 377 [2018]; J.P. Morgan Sec. Inc. v Vigilant Ins. Co., 21 NY3d 324, 334 [2013]). When the public policy favoring freedom to contract and the public policy prohibiting extensions of the limitations period before accrual of the cause of action come into conflict, however, the latter must prevail, inasmuch as "the parties to a contract are basically free to make whatever agreement they wish" only "[a]bsent some violation of law or transgression of a strong public policy" (Rowe v Great Atl. & Pac. Tea Co., 46 NY2d 62, 67-68 [1978]). To the extent plaintiff asserts that sophisticated commercial entities should be allowed to enforce clear contract language choosing a later accrual date than the date that would otherwise apply by law, plaintiff's remedy lies with the legislature (see CPLR 201; General Obligations Law § 17-103; compare Del Code Ann, tit 10, § 8106 [c] [amended in 2014 to provide that "an action based on a written contract . . . involving at least $100,000 may be brought within a period specified in such written contract . . . provided it is brought prior to the expiration of 20 years from the accruing of the cause of such action"]).
We respectfully disagree with our dissenting colleagues that a breach of the representations and warranties was only a "technical" breach of the MLPWA and that defendant's obligation to cure or repurchase non-conforming loans constituted a separate obligation of future performance (see Rivera, J., dissenting op at 
160-161), or that defendant agreed to a warranty against future default of non-conforming loans, i.e., a guarantee of future performance of defective loans, that persisted for the life of each underlying loan (see Wilson, J., dissenting op at 
167-172). Plaintiff expressly conceded that it "is not asserting here that the Accrual Clause is a guarantee of the loans' future performance," and plaintiff did not argue that we should overturn ACE or that its cure or repurchase obligations constituted a separate obligation of future performance. Rather, plaintiff contended that the accrual clause created a substantive condition precedent and did not violate public policy. "This Court generally refrains from addressing issues not argued by{**32 NY3d at 155} the parties, as we have recognized that, to do otherwise, would be unfair to the litigants, 'who expect us to decide their appeals on rationales advanced by the parties, not arguments their adversaries never made' " (Matter of 381 Search Warrants Directed to Facebook, Inc. [New York County Dist. Attorney's Off.], 29 NY3d 231, 247 n 7 [2017], quoting Misicki v Caradonna, 12 NY3d 511, 519 [2009]).
In addition, these interpretations of the MLPWA are not supported by the plain language of that agreement, or by the accrual clause itself. As we have explained, the MLPWA provides that defendant's cure or repurchase obligations are plaintiff's "sole remedies . . . respecting a breach of the foregoing representations and warranties," and the accrual clause applies to "[a]ny cause of action . . . relating to or arising out of the breach of any representations [*7]and warranties." We decide this appeal based solely on the contract language before us and the arguments the parties have made regarding that contract language.
[3] With that understanding, our holding today has no impact on contracts creating true substantive conditions precedent to a party's performance (see ACE, 25 NY3d at 597-598; Kassner, 46 NY2d at 550) or separate promises of future performance (see ACE, 25 NY3d at 594-596; Bulova Watch Co. v Celotex Corp., 46 NY2d 606, 610-611 [1979]), nor does it affect contractual provisions that comply with General Obligations Law § 17-103 or "specify[ ] a shorter, but reasonable, period within which to commence an action" (Kassner, 46 NY2d at 551). We simply hold that, to the extent the parties intended, "at the inception of the contract" and before the contract had been breached, to postpone accrual of a breach of contract cause of action to a subsequent uncertain date, the accrual clause "may not serve to extend the Statute of Limitations" in that way (id. at 552).
Accordingly, the order of the Appellate Division should be affirmed, with costs, and the certified question answered in the affirmative.

Rivera, J. (dissenting). This appeal is yet another in the vast litigation fallout from the financial crisis, and again requires this Court to explain the import of language contained in an agreement essential to the marketing and sale of residential mortgage-backed securities (RMBS) (see e.g. Ambac Assur. Corp. v Countrywide Home Loans, Inc., 31 NY3d 569 [2018];{**32 NY3d at 156} Nomura Home Equity Loan, Inc., Series 2006-FM2 v Nomura Credit & Capital, Inc., 30 NY3d 572 [2017]; ACE Sec. Corp., Home Equity Loan Trust, Series 2006-SL2 v DB Structured Prods., Inc., 25 NY3d 581 [2015]). In this latest chapter of the larger securities industry saga, we must decide the enforceability of a contractual provision that a cause of action accrues only upon the occurrence of expressly stated preconditions. There is nothing illegal or improper in this provision, which sets forth the elements of a cause of action and triggers New York's statute of limitations for breach of contract. Yet, the majority misconstrues decisional law and departs from our long-standing recognition of the freedom to contract leading it to mistakenly hold that this provision is without any legal effect. As there is no statutory or public policy bar to enforcement of the accrual clause, I dissent.
I.
[*8]Defendant Quicken Loans, Inc., as seller of various residential mortgage loans, voluntarily entered the Second Amended and Restated Mortgage Loan Purchase and Warranties Agreement (MLPWA). The MLPWA includes defendant's representations and warranties concerning its quality assessment of the loans, effective as of the mortgage loan closing date. No sale agreement for the mortgage loans, or structured financing based on the loans, would have been possible absent these defendant quality-control assurances (see Miguel Segoviano et al., Securitization: Lessons Learned and the Road Ahead at 18 [Nov. 2013], International Monetary Fund Working Paper 13/255, available at https://www.imf.org/external/pubs/ft/wp/2013/wp13255.pdf, cached at 
http://www.nycourts.gov/reporter/webdocs/WP13255.pdf).
The MLPWA also provides, in relevant part, that
"[a]ny cause of action against the Seller relating to or arising out of the breach of any representations and warranties made in Subsections 9.01 and 9.02 shall accrue as to any Mortgage Loan upon (i) discovery of such breach by the Purchaser or notice thereof by the Seller to the Purchaser, (ii) failure by the Seller to cure such breach, substitute a Qualified Substitute Mortgage Loan or repurchase such Mortgage Loan as specified above and (iii) demand upon the Seller by the Purchaser for compliance with this [MLPWA]."
{**32 NY3d at 157}By the clear language of this "accrual clause," defendant agreed that upon demand it would substitute or repurchase defective mortgage loans. It further understood and agreed that its failure to comply with this obligation would satisfy the elements of a cause of action for breach of contract and thus trigger the statute of limitations.
In its capacity as trustee for the securities backed by these mortgage loans, plaintiff Deutsche Bank National Trust Company sued defendant for failure to address, in accordance with the requirements of the MLPWA, violations of its various representations and warranties.[FN1] This action was filed six years and three months after the closing date of the last mortgage loan sold. Defendant moved to dismiss the complaint, in part on timeliness grounds. The Appellate Division affirmed dismissal, concluding that ACE Sec. Corp., Home Equity Loan Trust, Series 2006-SL2 v DB Structured Prods., Inc. (25 NY3d 581 [2015]) adopted a bright-line rule that an RMBS breach of contract claim accrues on the date defendant made the allegedly false representations and warranties. Thus, plaintiff's complaint was time-barred as it was filed more than six years after defendant entered the MLPWA (Deutsche Bank Natl. Trust Co. v Flagstar Capital Mkts. Corp., 143 AD3d 15 [1st Dept 2016]). For the reasons I discuss, the Appellate Division and now a majority of this Court have misapplied our prior holding in ACE.
II.
The parties agree that a cause of action arising from violations of the MLPWA representations and warranties is subject to the six-year statute of limitations in CPLR 213 (2) and disagree whether plaintiff commenced this litigation outside the limitations period. Plaintiff maintains that ACE does not apply and its action is timely as it was commenced in accordance with the MLPWA and the CPLR, i.e., plaintiff sued within six years from the date that defendant failed to comply with a proper demand to cure or repurchase the defective mortgage loans. Defendant counters that ACE controls and the parties may not agree to a different accrual date, meaning that in all RMBS cases the statutory limitation on a cause of action for breach of the mortgage loan representations and warranties{**32 NY3d at 158} starts to run on the closing date of the underlying defective loan. Defendant concedes that if the accrual provision is valid, plaintiff's claims were timely filed.
Defendant's argument is based on a faulty legal premise as ACE did not set a hard and fast rule that cannot be replaced by agreement of the parties. Instead, as the majority acknowledges, ACE announced a default accrual rule for a certain type of RMBS breach of contract action (majority op at 
146). Where the parties agree to a different obligation, with a different accrual date, we apply our usual rules of contract and interpret the agreement as the parties [*9]intended. Here, defendant bargained for an accrual date effective upon the breach of a specified promise to perform upon demand that takes its agreement outside the default rule announced in ACE.
III.
In Stonehill Capital Mgt. LLC v Bank of the W. (28 NY3d 439 [2016]), we explained that "[t]here is a difference between conditions precedent to performance and those prefatory to the formation of a binding agreement" (id. at 452). The Court explained:
"[A] condition precedent is an act or event, other than a lapse of time, which, unless the condition is excused, must occur before a duty to perform a promise in the agreement arises. Most conditions precedent describe acts or events which must occur before a party is obliged to perform a promise made pursuant to an existing contract, a situation to be distinguished conceptually from a condition precedent to the formation or existence of the contract itself" (id., quoting IDT Corp. v Tyco Group, S.A.R.L., 13 NY3d 209, 214 [2009]).
Plaintiff argues the demand to substitute or repurchase a defective loan, as set forth in the accrual clause, is a substantive condition precedent because no cause of action exists until the repurchase protocol is complete. In other words, plaintiff has no viable claim against defendant until the occurrence of each event set forth in the accrual provision—including a demand for defendant's performance of its obligation to substitute or repurchase—because once the demand is made defendant is obliged to perform, and its failure to do so is the last element of plaintiff's cause of action.
As the language of the accrual clause establishes, the demand requirement is a condition precedent to defendant's{**32 NY3d at 159} performance and a cause of action for a subclass of defective mortgage loans—those which the buyer expressly demands that defendant substitute or repurchase. In exchange for defendant's agreement to this condition precedent to the formation of a cause of action as relates to those loans, defendant limited its litigation exposure and its repurchase burden by giving it the opportunity to cure before being sued.
The commercial rationale for the accrual clause becomes clear when considered in light of the financial structure made possible by defendant's representations and warranties. An RMBS securitization is a complex process through which multiple home mortgage loans are transferred into a trust that issues debt securities to investors. As the respective borrowers repay the underlying mortgages, the securityholders receive payments in accordance with a priority scheme provided for in the securitization documents. By pooling loans, securitization enables financial diversification and shifts risk from mortgage issuers to investors (see Segoviano et al. at 6-7). Investors would be reticent to purchase without defendant's quality assurances about the underlying mortgage loans.
Notably, a securitization involves hundreds of mortgages rendering it unlikely that any single defective mortgage would require repurchase by defendant to ensure the value (and profits) of the securitized loan pool. In the context of this securitized agreement the seller and buyer are concerned with those misrepresentations which affect the value of the securitized loan pool. As to those misrepresentations, defendant expressly agreed that upon notice and demand it would substitute or repurchase defective loans, and its failure to do so would expose it to litigation and start running the limitations period. Thus, the accrual provision adopted here encourages investors to purchase, while at the same time reducing potential liability of defendant as the seller.
Defendant's reliance on ACE to avoid enforcement of the accrual clause is misplaced. In ACE, an RMBS trustee sued an RMBS transaction sponsor, alleging that the underlying mortgage loans in the securitized pool did not comply with the sponsor's representations and warranties (25 NY3d at 589). The trustee commenced its action more than six years after entering the pooling and servicing agreement, but argued that its claims did not accrue until the sponsor failed to comply with the agreement's remedial clause (id. at 590-593). This Court rejected the trustee's argument that its action was{**32 NY3d at 160} timely, concluding that because the "representations and warranties concern the [*10]characteristics of their subject as of the date they are made, they are breached, if at all, on that date" (id. at 589). However, the Court explained that "parties may contractually agree to undertake a separate obligation, the breach of which does not arise until some future date" (id. at 594). The Court further determined that the remedial clause at issue imposed a procedural, rather than substantive, condition precedent to the trustee's action and therefore did not delay accrual until the sponsor failed to comply (id. at 597-599). The Court explained that a procedural condition precedent "seeks a remedy for a preexisting wrong," while a substantive condition imposes "a condition to a party's performance" (id. at 597 [emphasis omitted]). If a substantive condition is unsatisfied, no claim exists (id.).
ACE thus announced a default accrual rule for the promises at issue in that case, and did not adopt a per se rule for all RMBS claims that trace back to the representations and warranties. What matters is the defendant's obligations as expressed in the agreement. In that vein, ACE made clear that until occurrence of a substantive condition to a party's performance, there can be no cause of action against the party for failure to perform its obligations under the contract.
The accrual clause here is not rendered unenforceable by ACE because ACE does not apply. Indeed, the agreement in ACE did not contain language similar to that found in the accrual clause and so the Court had no occasion to consider the import of this different language. Yet, the Court could not have been clearer in emphasizing that a different accrual rule and different outcome holds where parties agree to a separate obligation, one that includes a condition precedent. While a violation of the representations and warranties would be a technical breach of the MLPWA, defendant committed to a separate obligation, one that it breached later than the effective date of the representations and warranties because it promised to substitute or repurchase upon the buyer's demand. Failure to comply with that obligation—cure upon demand—completes the elements of the cause of action, which then subjects defendant to liability and starts the six-year statute of limitations running against the buyer. Thus, defendant agreed to the{**32 NY3d at 161} type of "separate obligation, the breach of which does not arise until some future date" (id. at 594).[FN2] IV.
Enforcement of the accrual provision is wholly aligned with the public policies animating both the freedom to contract and our statute of limitations. There is no dissonance between enforcement of the accrual clause and societal goals, no weighing of competing interests as the majority posits (majority op at 
143, 154), and no reason to allow defendant to escape the consequences of its arm's length bargain.
The freedom to contract "is deeply rooted in public policy" and encourages "transactions freely entered into" (New England Mut. Life Ins. Co. v Caruso, 73 NY2d 74, 81 [1989]; Restatement [Second] of Contracts, ch 8, Introductory Note ["The principle of freedom of contract is itself rooted in the notion that it is in the public interest to recognize [*11]that individuals have broad powers to order their own affairs by making legally enforceable promises"]). Parties are free to arrange their commercial activities in a manner that furthers their interests, so long as their agreement does not violate a statutory prohibition or public policy (see Oppenheimer & Co. v Oppenheim, Appel, Dixon & Co., 86 NY2d 685, 695 [1995] ["Freedom of contract prevails in an arm's length transaction between sophisticated parties such as these, and in the absence of countervailing public policy concerns there is no reason to relieve them of the consequences of their bargain"]; see also Faison v Lewis, 25 NY3d 220, 227 [2015] [noting that "compelling policy reasons" can support non-enforcement of contractual agreements], citing Riverside Syndicate, Inc. v Munroe, 10 NY3d 18, 22-23 [2008]). The right to contract includes the right to define a cause of action that triggers the statute of limitations for promises broken (see Oppenheimer, 86 NY2d at 695).{**32 NY3d at 162}
Notably, our solicitude of the parties' agreement has been shaped by New York's unique status as a global center of finance and commercial transactions. As the Court has recognized, "[i]n order to maintain [New York's] pre-eminent financial position, it is important that the justified expectations of the parties to the contract be protected" (J. Zeevi & Sons v Grindlays Bank [Uganda], 37 NY2d 220, 227 [1975]; see also Bluebird Partners v First Fid. Bank, 94 NY2d 726, 739 [2000] [concluding that refusal to enforce contract could "engender uncertainties in the free market system in connection with untold numbers of sophisticated business transactions—a not insignificant potentiality in the State that harbors the financial capital of the world"]). That policy is further illustrated by the legislative enactment of statutes that "promote and preserve New York's status as a commercial center and . . . maintain predictability for the parties" (IRB-Brasil Resseguros, S.A. v Inepar Invs., S.A., 20 NY3d 310, 315-316 [2012]; see also General Obligations Law § 5-1401).
Still, contracts are subject to statutes of limitations. Oliver Wendell Holmes posited, "What is the justification for depriving a [person] of . . . rights, a pure evil as far as it goes, in consequence of the lapse of time? . . . Sometimes the desirability of peace [is offered], but why is peace more desirable after twenty years than before?" (Oliver W. Holmes, Jr., The Path of the Law, 10 Harv L Rev 457, 476 [1897]). Like other jurisdictions, we have justified statutes of limitations on breach of contract claims because they protect a party from defending against stale claims and promote society's interest in closure (John J. Kassner & Co. v City of New York, 46 NY2d 544, 550 [1979]). Those dual concerns are not implicated when parties uncoerced and voluntarily enter an arm's length transaction that sets forth the elements and point of accrual of a cause of action for breach of the promise to cure upon demand at issue here.
The potential for litigation of stale claims is minimal as the information regarding the defective loans is archived and documented. Moreover, the contracting parties have set the accrual date and thus can take steps to avoid the deterioration of evidence which is another reason to avoid stale claims.
Similarly, the concern for repose is no concern at all under the circumstances presented by this agreement. It is not uncommon for contractual obligations to extend well beyond the maximum 30-year life of the mortgage loans at issue here{**32 NY3d at 163} (e.g. Plaza Hotel Assoc. v Wellington Assoc., 37 NY2d 273, 278 [1975] [enforcing a contract provision that restricted land use for 50 years and noting that "it is not a function of the courts to insure the profitability of business transactions, nor do they have the power to remedy a failure of the parties to foresee far-ranging changes in the economy"]; Murphy v Erie County, 28 NY2d 80, 87 [1971] [upholding a contract to lease a stadium for 40 years]). Further, unlike other contracts where a breach may occur at an uncertain future date, when defendant entered the agreement it knew that the limitations period would run, at the latest, six years after the maturity date of the final mortgage loan to close. What could be more certain and predictable than knowing your outside litigation exposure date?
Nor, as the majority concludes, does the accrual clause violate General Obligations Law § 17-103 (majority op at 
152-154). That section provides, in pertinent part:
"A promise to waive, to extend, or not to plead the statute of limitation applicable to an action arising out of a contract express or implied in fact or in law, if made after the accrual of the cause of action and made, either with or without consideration, in a writing signed by the promisor or his agent is effective, according to its terms, to prevent interposition of the defense of the statute of limitation in an action or [*12]proceeding commenced within the time that would be applicable if the cause of action had arisen at the date of the promise, or within such shorter time as may be provided in the promise. . . .
"A promise to waive, to extend, or not to plead the statute of limitation has no effect to extend the time limited by statute for commencement of an action or proceeding for any greater time or in any other manner than that provided in this section, or unless made as provided in this section." (General Obligations Law § 17-103 [1], [3].)
As the language reveals, it has no application here. The accrual clause does not waive or extend the statute of limitations, nor does it prohibit defendant from pleading an affirmative limitations defense. Instead, the accrual clause sets forth the elements of the cause of action and the condition precedent that must occur before the commencement of the limitations{**32 NY3d at 164} period. The limitations period at all times and for all claims remains six years.
In Kassner, this Court explained that the section 17-103 prohibition against pre-accrual waivers and extensions of the statute of limitations avoids coerced or ill-considered promises. That is the case because "there is a greater likelihood that a 'waiver' or extension of the defense, as part of the initial contract or obligation, was the result of ignorance, improvidence, an unequal bargaining position or was simply unintended" (Kassner, 46 NY2d at 551). Nothing could be further from reality here. Defendant describes itself as "the nation's largest mortgage lender" (Quicken Loans, Press Room, Fast Facts, https://www.quickenloans.com/press-room/fast-facts/, cached at 
http://www.nycourts.gov/reporter/webdocs/FastFactsQuickenLoansPressroom.pdf), closing $2 billion in loans in 2006 (Quicken Loans, Press Room, Quicken Loans Crosses $2 Billion Milestone in Monthly Retail Home Lending Volume Closed During March 2007 is All-Time Company Record and Most Closed Online in U.S. History [Apr. 13, 2007], https://www.quickenloans.com/press-room/2007/04/03/quicken-loans-crosses-2-billion-milestone-monthly-closing-volume-21-billion-monthly-retail-home-lending-volume-closed-march-2007-alltime-company-record-closed-online-history/, cached at 
http://www.nycourts.gov/reporter/webdocs/QuickenLoansCrosses$2BillionMilestoneInMonthlyClosingVolume.pdf). By its own account then, defendant is a highly sophisticated party and could not have misunderstood its obligations under the terms of the RMBS agreement. Defendant entered the MLPWA with eyes open, anticipating a profitable venture. Its agreement to the accrual clause was not a "result of ignorance, improvidence, an unequal bargaining position" nor does it reflect defendant's "unintended" choice (Kassner, 46 NY2d at 551).
V.
Defendant made representations and warranties as to its quality assessment of the residential mortgage loans that are the subject of the MLPWA. It sought to profit from the sale of the securitized pool populated by those same loans and made possible by its representations. Defendant also promised that upon demand it would substitute or repurchase defective mortgage loans, and that a cause of action would accrue upon{**32 NY3d at 165} defendant's failure to perform this obligation. Since no New York law or public policy prohibits enforcement of this accrual clause, which reflects defendant's bargained-for, arm's length transaction, I would reverse and answer the certified question in the negative.

Wilson, J. (dissenting). Both here and in our prior decision in ACE Sec. Corp., Home Equity Loan Trust, Series 2006-SL2 v DB Structured Prods., Inc. (25 NY3d 581 [2015]) we have fundamentally misinterpreted the structure of residential mortgage-backed securities (RMBS) agreements and, as a result, have created bad law: bad because it neither hews to the intent of the contracting parties nor of the investors in securities issued thereby; bad because it serves no public policy; bad because it disserves a very important public policy—the preservation of New York's role as the commercial center of the nation. Best, of course, would be to admit our recent mistake in ACE and move forward. Next best, as Judge Rivera sets forth in her dissent (in which I fully concur), would be to recognize that the contract here is substantially different from that in ACE. Doing so allows a path for other parties to structure RMBS agreements as intended without giving them a reason to choose the law of some other state because New York considers these agreements against a public policy supposedly undergirding limitations periods.
I.
It helps to begin with the residential mortgage business as it existed at the time George Bailey was running the building and loan association in Bedford Falls (see It's a Wonderful Life, Frank Capra Dir. [RKO Radio Pictures 1946]). Bank customers deposited their savings in savings and loan institutions and earned a passbook rate of interest. The savings and loans, in turn, loaned money to homebuyers at a higher rate of interest, allowing the savings and loan to pay interest to its depositors and retain the difference for operations and to pay dividends to shareholders of the institutions. The savings and loans carefully evaluated the creditworthiness of the borrower and the value of the mortgaged property, because the institution's livelihood depended on making safe loans. (This was not true of George Bailey, but was true of his more traditional nemesis, Mr. Potter.) The above made for a fairly tight credit market.
Flash forward half a century. Some creative financial types concluded that much more credit could be made available to{**32 NY3d at 166} homebuyers (from which the financial types could profit) if home mortgages could be grouped into pools and investors paid a return from the pooled securities. Investors could feel secure purchasing the securities if they knew that the only risk they were absorbing was market risk (which comes in two flavors: risk that exogenous economic conditions would deteriorate, and risk associated with the estimated quality of the particular pool of loans underlying the securities), not the risk that the homeowner never should have qualified for the mortgage in the first place. The depositor (the financial institution collecting the mortgages, putting them into a pool and issuing the securities) would agree to assume the risk of unqualified borrowers, without examining the underlying documentation supporting each loan, so long as its liability was confined to replacing or repurchasing mortgages in the pool that did not conform to a set of requirements for qualifying a borrower (that is, no liability for fraud, punitive damages, rescission, etc.).
Those requirements for qualifying borrowers are styled as representations and warranties. RMBS sponsors guarantee that, upon issuance, each mortgage in the pool satisfies a large number of criteria regarding the quality and characteristics of each loan. Those commonly include the appraised property value, the home occupancy status, and the mortgagor's income, assets, existing debt obligations, debt-to-income ratio, and total mortgage debt obligations as compared to the value of the mortgaged property. Those characteristics provide information about the likelihood that a mortgagor will be able to make his or her mortgage loan payments. That allows ratings agencies to assign a credit rating to each certificate, which in turn enables investors to assess the risk of each RMBS pool. Investors purchase [*13]the loans based on the representations and warranties from the seller that the loans meet specified characteristics and, therefore, that they have a specified risk profile.
The great innovation was contractual allocation of risk between the depositor and the trustee (on behalf of the investors), whereby the depositor could assure investors that, in purchasing the securitized loans, the investors would bear market risk (e.g., the risk that unemployment would rise and some homeowners would default) but not the issuance risk (e.g., the risk that the appraised value of a home or the borrower's income or credit history had been inflated). A simple 2x2 table illustrates this arrangement:{**32 NY3d at 167}

Homeowner pays mortgage
Homeowner defaults

Homeowner qualified
Everyone happy
Market risk accepted by investors

Homeowner unqualified
Everyone happy
Issuance risk accepted by depositor

Because the depositor assumed the issuance risk, the depositor could choose to avoid loan-level examination of the underlying mortgages, and the trustee and investors could rely on the warranty provided by the depositor, without any need to examine whether each of the underlying mortgages had been issued properly or improperly. To make the market work without the loan-by-loan inspection on which Mr. Potter would have insisted if assuming mortgages issued by George Bailey, the parties make a deal: the repurchase protocol. The investor will still invest, even though the representations and warranties have not been verified loan-by-loan and even though its trustee will not be able to sue simply because the representations and warrantees were false when made; for the seller, this investment provides necessary cash flow to pay principal and interest on the loans. The seller, in exchange, promises that it will repurchase, cure, or substitute any loan falling into the bottom right-hand box; for the investors, this provides essential reassurance that their investment bears only the market risk for which they bargained.
The repurchase protocol superficially appears to create two distinct contractual agreements between the parties:[FN*] first, that the representations and warranties are true at the time each mortgage is issued, and second, that the seller will follow the repurchase protocol if: (a) the borrower defaults; (b) one or more of the representations and warranties was not true when the loan was issued; and (c) the trustee thereafter requests repurchase or replacement of the loan in question. Investors{**32 NY3d at 168} could not—and would not—bear the risk of purchasing certificates without some assurance that the seller will bear the risk of the nonconformity for the life of the loan. But the investors do not care that representations and warranties were false if the homeowner never defaults. They rely on the bargained-for [*14]assurance that the sponsor has taken on the risk to cure, repurchase or substitute any defective loan within 60 days of when the defect was discovered (and demand made)—and that that assurance lasts not merely six years from closing, but for the life of the loan (because the homeowner may default at any time).
Without immense cost, neither party can feasibly verify the characteristics set forth in the representations and warranties as to each of the thousands of loans in the pool. Investigating the accuracy of the closing characteristics for mortgages that never go into default is a waste of time; the RMBS structure depends, in substantial part, on the efficiency involved in eliminating that waste. It would thus undermine that structure to allow a party to sue for breach of those terms themselves.
Our recent decisions hold as much. In Nomura, we held that where a "sole remedy" provision designates a repurchase protocol as the remedy for breach of representations and warranties, the parties are precluded from seeking general contract damages for breaches of representations and warranties that involve the underlying mortgages (Nomura Home Equity Loan, Inc., Series 2006-FM2 v Nomura Credit & Capital, Inc., 30 NY3d 572, 584 [2017]; see also Ambac Assur. Corp. v Countrywide Home Loans, Inc., 31 NY3d 569 [2018]). That was because "[c]ontract terms providing for a 'sole remedy' are sufficiently clear to establish that no other remedy was contemplated by the parties at the time the contract was formed, for purposes of that portion of the transaction, especially when entered into at arm's length by sophisticated contracting parties" (30 NY3d at 582 [citations and some internal quotation marks omitted]).
The import of our decisions in Nomura and Ambac is that, by agreement of the parties, the first "breach" for falsity of the representations and warranties concerning the mortgages does not exist. Only the warranty, good for the life of each underlying mortgage, exists. That is, there is no cause of action until a party fails to comply with the repurchase protocol; it is for this breach that Deutsche Bank sues. Tying a party's ability to bring suit to the date of closing links the cause of action to a "breach" that, pursuant to the parties' agreement, is not a breach at all.{**32 NY3d at 169}
The majority misconstrues the overall structure and purposes of RMBS securitization, which calls the loan conditions "representations and warranties" while simultaneously removing the ability to sue for breaches of those representations and warranties via the sole remedy provision. Here, the contract is even more explicit than the contract in ACE, which did not contain an accrual provision. But in all cases, the repurchase protocol is central to the structure of an RMBS agreement: both parties intend that the sole remedy cannot be invoked until a loan defaults; the trustee demands the sole remedy; the depositor fails to repurchase or replace the loan; and investigation shows that the loan, when issued, did not meet one or more of the representations and warranties. Having correctly barred trustees from suing for naked breaches of the representations and warranties, imposing a six-year limitations period for breach of the repurchase protocol defeats the efficiencies created by the RMBS structure, contradicts the clear terms of the parties' agreement, and leaves the trustee with no viable recourse—including the one it bargained for.
II.
ACE is wrong. We should abandon it, whether judicially or legislatively. The sole remedy provision in RMBS agreements is best thought of as a plain vanilla warranty, good for the life of each underlying mortgage. The economic reality—understood by depositor, trustee and investors alike—is that before securitizing the loans, the depositor did not examine each loan file to determine compliance with the representations and warranties. Instead, the depositor has warranted that when any loan goes bad, it will make the investors whole by substituting a good loan or repurchasing the loan. That is the essence of the agreement.
In ACE, we held:
"The Trust . . . seeks to persuade us that its claim did not arise until DBSP refused to cure or repurchase, at which point the Trust . . . had six years to bring suit. Thus, the Trust views the repurchase obligation as a distinct and continuing obligation that DBSP breached each time it refused to cure or repurchase a non-conforming loan. . . .
"Although parties may contractually agree to undertake a separate obligation, the breach of{**32 NY3d at 170} which does not arise until some future date, the repurchase obligation undertaken by DBSP does not fit this description" (ACE Sec. Corp., Home Equity Loan Trust, Series 2006-SL2 v DB Structured Prods., Inc., 25 NY3d 581, 594 [2015]).
[*15]
That portion of our holding errs by concluding that the parties intended that the trustee could sue when either of the lower boxes of my simple table pertained. Instead, the parties to an RMBS transaction understand that suit is permitted only when the lower right-hand box does.
When we understand the standard RMBS agreement as a warranty springing upon future default as to only those loans improperly issued, it becomes still clearer why ACE is wrong. If I enter into a contract to sell you a toaster and give you a 10-year warranty, no one would argue that, if the toaster fails in year eight, the six-year statute of limitations bars you from enforcing the warranty—even if you knew in year one that the toaster had a latent defect and might fail for that reason.
Our decision in Bulova Watch Co. v Celotex Corp. (46 NY2d 606 [1979]) should control. There, Celotex entered into a contract with Bulova that included a 20-year guarantee on a roof Celotex installed, "expressly guarantee[ing] that [Celotex] would 'at its own expense make any repairs . . . that may become necessary to maintain said Roof' " (ACE, 25 NY3d at 595). ACE distinguishes Bulova on the ground that the "service" of repairing the roof "was the separate and distinct promise to repair a defective roof—a critical component of the parties' bargain and 'a special, separate and additional incentive to purchase' the defendant's product" (id.). That is not a distinction at all: the roof was represented to be the kind of roof that would last 20 years; in ACE, as here, the securitized loans were represented to have certain characteristics as outlined in the representations and warranties. If either proved untrue, there was a separate promise to repair the failure: in Bulova, to replace the roof, and in ACE and the instant case, to replace the nonconforming loan. Both promises were "critical" and "special, separate incentives"—indeed, much more so in an RMBS securitization, which would not occur at all without that promise, than in a roofing contract, which could still proceed without the warranty (id.). The first promise is the representations and warranties on the loans. There is, however, no cause of action or remedy for breaching those representations and warranties (see Nomura, 30 NY3d at 577; Ambac, 31{**32 NY3d at 171} NY3d at 582). Instead, an investor invests because of the second promise: that the seller will repurchase, cure, or substitute any loans that, upon closing, did not conform with the representations and warranties. The relevant breach is of the second promise; the representations and warranties of the first promise are really a portion of the condition allowing suit on the second—not an independent breach entitling suit.
Furthermore, ACE contends that "the remedial clause in Bulova Watch expressly guaranteed future performance of the roof . . . . DBSP, by contrast, never guaranteed the future performance of the mortgage loans" (25 NY3d at 595). Indeed, DBSP did not guarantee the future performance of all the mortgage loans—but it did guarantee the future performance of any defectively-issued loans. The majority here affirms that guarantee, thus rejecting ACE's distinction of Bulova, but limits the guarantee to six years, for reasons unrelated to the parties' intent in contracting. The fact that the future guarantee of performance in an RMBS offering is limited to a subset of the loans does not distinguish it from Bulova. If the guarantee in Bulova had been only for the roof over the north wing of the factory, the absence of a guarantee for the south wing would not have voided the north wing guarantee.
Last, ACE observed, "it makes sense that DBSP, as sponsor and seller, would not guarantee future performance of the mortgage loans, which might default 10 or 20 years after issuance for reasons entirely unrelated to the sponsor's representations and warranties" (id. at 595-596). That statement exposes the Court's misunderstanding of the fundamentals of RMBS securitization. The sponsor does not guarantee the performance of all the loans; instead, to induce investors to purchase the securities backed by the loan pool, it guarantees the performance of only those as to which the representations and warranties were not true as of the date of issuance. That gives the depositor some incentive to satisfy itself that the representations and warranties are true, but more importantly assures investors that their exposure will be limited to market risk, not any risk that might arise from improperly issued loans. The depositor holds the bag for all defaulting loans that were improperly issued, but the bag it holds is limited to replacing or repurchasing the loans. For all loans as to which the representations and warranties are true as of the closing date, the issuer guarantees nothing. Additionally, even though the issuer guarantees the performance—perhaps 30 years down {**32 NY3d at 172}the line—of all defective loans, it has no contractual obligations as to the defective loans unless the conditions are met; therefore, as to defective loans that are not in default (or perceived to be likely to go into default), the guarantee again amounts to nothing.
ACE—and today's majority—conflate the representations and warranties with the separate, bargained-for obligation to cure or repurchase loans that did not meet the specified qualifications. Failure to comply with a [*16]repurchase protocol is properly understood as the latter, a simple warranty as to the subset of defaulting loans, whose identity could not be known as of the date of issuance.
III.
Perhaps troubled by the clearly-expressed intent of the parties, the majority concludes that it "need not resolve this dispute regarding the meaning of the accrual clause" because it is unenforceable as against public policy (majority op at 
150). But the majority fails to identify any substantive policy that this contract violates. It is not enough to say that there is a public policy against extending statutes of limitations without some explanation of what that policy is intended to do and why it matters here. As Judge Rivera explains, New York's public policy of repose serves to ensure that private parties can organize their affairs and are protected from having to defend stale claims. To the extent that any broader societal interest in repose exists, it does not apply here; there is no purpose in preventing parties who contract for a long warranty from doing so. Instead, the majority's decision imposes repose on parties that expressly agreed they did not have that concern.
In contrast, by understanding the RMBS agreements as warranties, in which breach occurs only upon the depositor's refusal to comply with the repurchase protocol, the Second Amended and Restated Mortgage Loan Purchase and Warranties Agreement provides a mutual benefit to the parties. The agreement benefits the trustee by ensuring its risk, and it benefits the depositor by guaranteeing a 60-day period to investigate and cure or substitute a defective loan. Kassner, in contrast, expresses our concern that an agreement to "postpone the time from which the period of limitation is to be computed" unduly benefits the non-breaching party (John J. Kassner & Co. v City of New York, 46 NY2d 544, 551 [1979] [emphasis omitted]). Because the repurchase protocol is designed to benefit{**32 NY3d at 173} both parties to an RMBS contract, that concern of unilateral benefit does not apply here and, therefore, does not disrupt the public policy of private repose.
Relatedly, as Judge Rivera observes, the rule agreed to by the parties here does not implicate the policy concerns that drive prohibition of a traditional discovery rule. The parties have contractually agreed that default is a necessary condition for suit, and they know that default may occur at any point during the life of a loan. Additionally, the cause of action for that default does not accrue until the trustee makes a demand of the depositor, and the depositor fails to repurchase or replace within 60 days of that demand. That structure eliminates from the process the subjectivity and uncertainty that generally clouds the inquiry as to when or whether a party knew or should have known of a breach.
Although neither the parties nor the majority mentions it, there might be a public policy concern that judicial decisions not be made on the basis of stale evidence: 30 years later, witnesses may be dead or unavailable, their memories will have faded, and documents may have been lost. That concern does not pertain here, because the parties were on notice—through their own agreement—that they were required to keep the relevant documents throughout the life of the loan. The parties placed on the depositor the risk of loss, incompleteness or initial nonexistence of the proof that any particular loan complied with the representations and warranties. (For obvious reasons, mortgage origination files and related documentation are preserved at least until the mortgage is satisfied or otherwise terminated, which may be 30 years from origination.) Where sophisticated parties have notice that they are responsible for maintaining those records for as long as a claim may arise and bargain for the placement of liability when records prove incomplete, no public staleness concern is present.
What is unclear from the majority's use of public policy to void the clear intent of the parties is how far that public policy would carry. Suppose, instead of wording their agreement to defer accrual of the cause of action, the parties here instead crafted an agreement along the following lines: (1) as to any loans that did not, at the time of issuance, meet all of the following 79 criteria, the depositor guarantees them against default for the life of the loan; (2) if any such loan defaults, the trustee may demand, as its sole remedy, that the depositor replace or repurchase the loan; (3) as to all loans that conform{**32 NY3d at 174} to the 79 criteria, and as to all loans that do not default (regardless of whether they conform to the criteria), the trustee shall have no ability to sue. Would the claimed public policy bar that agreement? It is functionally identical to the agreement here but is worded more directly as a guarantee. If the above formulation does not violate the claimed public policy, how can we justify voiding the parties' clear intent here based on that public policy? If it does, how does New York permit any contractual warrantees longer than six years?
[*17]
In contrast to the claimed public policy whose purpose is vacant here, New York has a long-standing and robust public policy to maintain its status as the nation's center for sophisticated commercial activity. As Judge Rivera has detailed, this Court and the legislature have reaffirmed that policy time and again (see Rivera, J., dissenting op at 
162).
Where ACE and today's decision needlessly bar the parties' clearly expressed intent, Delaware understands the commercial reality of RMBS transactions. Faced with the issue in ACE, the Delaware Chancery Court concluded: "the Accrual Provision operated as a condition precedent to when a claim arose and the statute of limitations began to run. That condition could not have been met until the Trust demanded in December 2011 that EMC comply with the Repurchase Provision and then EMC failed to repurchase loans" (Bear Stearns Mtge. Funding Trust 2006—SL1 v EMC Mtge. LLC, 2015 WL 139731, *12, 2015 Del Ch LEXIS 9, *36 [Jan. 12, 2015, C.A. No. 7701-VCL]).
If we knew whether the claimed public policy here could be avoided by different language, that would be one thing. But were I advising a party to a prospective RMBS agreement today, I would tell my client that the law of Delaware is clear (subject, I suppose, to the possibility that the Delaware Supreme Court might someday reject the Chancery Court's holding), and the law of New York is not. Here, the parties chose New York law—the common choice of sophisticated commercial parties—based on the expectation that New York courts are commercially sophisticated and will enforce their bargained-for agreements (see Theodore Eisenberg & Geoffrey P. Miller, The Flight to New York: An Empirical Study of Choice of Law and Choice of Forum Clauses in Publicly-Held Companies' Contracts, 30 Cardozo L Rev 1475, 1490 [2009] [finding that in the United States, 46% of commercial parties select New York law to govern contractual agreements]). By contradicting the parties' unambiguous agreement for amorphous{**32 NY3d at 175} public policy reasons whose sweep is unknown, today's decision undermines a public policy whose sweep undergirds our economy.
For the above reasons, I dissent.
Chief Judge DiFiore and Judges Stein and Feinman concur; Judge Rivera dissents in an opinion, in which Judge Wilson concurs in a separate dissenting opinion; Judge Garcia taking no part.
Order affirmed, with costs, and certified question answered in the affirmative.

Footnotes

Footnote 1:The summons with notice also named Flagstar Capital Markets Corporation as a defendant, but plaintiff later voluntarily discontinued its claims against Flagstar, and Flagstar is not a party to this appeal.

Footnote 2:Supreme Court also addressed several additional issues that are not raised by the parties before this Court.

Footnote 1:In its complaint, plaintiff alleges that defendant misrepresented borrowers' debts and debt-to-income ratios, income, and property values, among other things.

Footnote 2:The majority appears to misunderstand this point. As explained above (supra at 
158-159), refusal to cure or repurchase non-compliant loans was a condition precedent to any claim alleging breach of the representations and warranties. The majority further contends that plaintiff "did not argue . . . that its cure or repurchase obligations constituted a separate obligation of future performance" (majority op at 
154). Not so. Plaintiff expressly argued that defendant undertook "to investigate the loans" upon demand and "cure or repurchase" any non-compliant loans (brief for appellant at 26). It is difficult to see how defendant could investigate allegedly non-compliant loans and cure or repurchase such loans without acting after the date on which the representations and warranties became effective, i.e., in the future.

Footnote *:The parties have styled their agreement as two separate promises: first, the promise that the representations and warranties are true at the time the mortgage is deposited into the pool, and second, the promise that if: (a) the mortgage is in default; (b) one or more representations and warranties as to that loan was untrue at the time of deposit; (c) the trustee demands the repurchase protocol; and (d) the depositor refuses, then the "sole remedy" may be pursued by the trustee. As I discuss below, the first promise is not actionable as between the contracting parties and is therefore only superficially a separate contractual promise—one as to which, if breached, the parties have agreed there is no remedy.