# State of New York Court of Appeals

OPINION

This opinion is uncorrected and subject to revision before publication in the New York Reports.

No. 84
Deutsche Bank National Trust Company, &c.,
     Appellant,
   v.
Barclays Bank PLC,
     Respondent.
------------------------------------------------------------
Deutsche Bank National Trust Company, &c.,
     Appellant,
   v.
HSBC Bank USA, National Association,
     Respondent.

Douglas H. Hallward-Driemeier, for appellant.
Nicholas J. Boyle, for respondent HSBC Bank USA, National Association.
Jeffrey T. Scott, for respondent Barclays Bank PLC.

FAHEY, J.:

New York State is a national and international leader in commerce. As a result, large numbers of contracting parties in the United States include New York choice-of-law and forum selection clauses in their contracts.[1] This fact amplifies the effect of every

---

[1] See Theodore Eisenberg & Geoffrey P. Miller, The Flight to New York: An Empirical Study of Choice of Law and Choice of Forum Clauses in Publicly-Held Companies' Contracts, 30 Cardozo L Rev 1475 (2009).

decision made by this Court in the area of contract law.

Here, plaintiff asks us to apply a multi-factor analysis to determine that its causes of action accrued in New York for purposes of CPLR 202. We decline to apply such a test, and instead rely on our general rule that when an economic injury has occurred, the place of injury is usually where the plaintiff resides. We further conclude that plaintiff's causes of action accrued in California, and that its actions are untimely pursuant to CPLR 202.

I.

These appeals stem from two residential mortgage-backed securities (RMBS) transactions. As we explained in ACE Sec. Corp., Home Equity Loan Trust, Series 2006-SL2 v DB Structured Prods., Inc. (25 NY3d 581 [2015] [hereinafter ACE]), an RMBS transaction involves the bundling of mortgage loans into a pool that is sold to an affiliated purchaser, which then places the loans into a trust for securitization purposes (see id. at 590; Nomura Home Equity Loan, Inc., Series 2006-FM2 v Nomura Credit & Capital, Inc., 30 NY3d 572, 577-578 [2017]). The trust then issues certificates that are purchased by investors, or certificateholders (see ACE, 25 NY3d at 590). "The individual mortgage loans served as collateral for the certificates, which paid principal and interest to certificateholders from the cash flow generated by the mortgage loan pool; that is, certificateholders made money when the borrowers made payments on their loans" (id.). High default rates by borrowers led to the collapse of the subprime housing market, a primary factor in the ensuing precipitous market decline and recession.

In each of the two transactions at issue, plaintiff Deutsche Bank National Trust Company is the trustee for the RMBS trust. The relevant contracts in each transaction

contained the familiar cure-or-repurchase provisions (see Nomura, 30 NY3d at 579-581; ACE, 25 NY3d at 590), and the contracts at issue in the Barclays action contained an "accrual clause" substantially similar to the one we addressed in Deutsche Bank Natl. Trust Co. v Flagstar Capital Mkts. (32 NY3d 139, 144-145 [2018]).

Plaintiff commenced the first action against defendant Barclays Bank PLC (Barclays), alleging breaches of the representations and warranties Barclays made about the underlying mortgage loans, on April 12, 2013, six years from the closing date of the RMBS transaction. Plaintiff commenced the second action against defendant HSBC Bank USA, National Association (HSBC), also alleging breach of the representations and warranties, on June 5, 2013, six years from the closing date of that transaction.

Defendants moved to dismiss the actions, contending, among other things, that they were untimely. Defendants argued that pursuant to CPLR 202, New York's borrowing statute, plaintiff's claims must be timely under both the laws of New York and of California, where plaintiff resides. The parties agree that if New York's six-year limitations period for breach of contract actions applies (see CPLR 213 [2]), plaintiff's actions are timely. California, however, has a four-year limitations period for breach of contract actions (see Cal Civ Proc Code § 337). Defendants argued that as a resident of California, plaintiff suffered economic injury in California, and therefore plaintiff's causes of action accrued in California for the purposes of CPLR 202. Plaintiff conceded that it was a resident of California. It argued, however, that instead of applying the general rule that an economic injury is suffered where the plaintiff resides to determine where the cause of action accrued, the court should apply a multi-factor analysis. Plaintiff asserted that

because it was suing in a representative capacity on behalf of the trusts, it did not suffer real economic loss, and its residence was irrelevant, or at least not the primary consideration, for determining the place of accrual.

Supreme Court denied defendants' motions to dismiss to the extent those motions sought dismissal on statute of limitations grounds (see 2015 NY Slip Op 32252[U] [Sup Ct, NY County 2015]).  It noted that other courts had rejected the plaintiff-residence rule for determining the place of accrual where the plaintiff is a trustee suing in a representative capacity (see id. at *3-4).  Considering what it determined to be the relevant factors, the court observed that the trusts were created pursuant to New York law, and that the parties had chosen New York substantive law to govern their rights (see id. at *4-5).  The court rejected defendants' arguments that other factors—such as where the mortgage notes were held and where the payment of state taxes was contemplated—pointed to California as the place of economic injury (see id. at *5-6).[2]

The Appellate Division unanimously reversed and granted defendants' motions to dismiss the complaints (156 AD3d 401 [1st Dept 2017]).  The Appellate Division concluded that it need not decide whether the plaintiff-residence rule or the multi-factor analysis proposed by plaintiff applied because even under a factor analysis, plaintiff's claims accrued in California (see id. at 402).  The Court reasoned that the mortgage loans were originated by California lenders and primarily encumbered real property located in California, the relevant agreements contemplated payment of state taxes, if any, in

_____

[2] The court granted defendants' motions to dismiss certain of plaintiff's causes of action for other reasons, which plaintiff did not challenge on appeal (see id. at *6-11).

California, and the agreements stated that the mortgage notes may be held in California, but not New York (see id. at 402-403). For these reasons, the Appellate Division concluded that the application of a multi-factor test pointed to California as the place of accrual (id.). The Appellate Division further concluded that plaintiff's actions were untimely under the California statute of limitations (see id. at 403-404).

We granted plaintiff leave to appeal in both actions (32 NY3d 904, 905 [2018]).

There are two primary issues on this appeal. The first is where plaintiff's causes of action for breach of contract accrued for purposes of CPLR 202, and which test we should apply to answer that question. If we determine that California is the place of accrual, the second issue is whether plaintiff's causes of action are timely according to California's limitations period. We address each issue in turn.

II.

CPLR 202, New York's borrowing statute, provides:

> "An action based upon a cause of action accruing without the state cannot be commenced after the expiration of the time limited by the laws of either the state or the place without the state where the cause of action accrued, except that where the cause of action accrued in favor of a resident of the state the time limited by the laws of the state shall apply."

"In other words, '[w]hen a nonresident sues on a cause of action accruing outside New York, CPLR 202 requires the cause of action to be timely under the limitation periods of both New York and the jurisdiction where the cause of action accrued' " (2138747 Ontario, Inc. v Samsung C&T Corp., 31 NY3d 372, 377 [2018], quoting Global Fin. Corp. v Triarc Corp., 93 NY2d 525, 528 [1999]). It is undisputed that plaintiff is not a resident

of New York and therefore that CPLR 202 applies unless plaintiff's causes of action accrued in New York. As noted, the parties agree that if plaintiff's causes of action accrued in New York, then CPLR 202 does not apply, and plaintiff's actions are timely as to both defendants.[3]

A.

We first consider what test should apply to determine the place of accrual under CPLR 202. Defendants argue that this Court should apply the plaintiff-residence rule, which states that "[w]hen an alleged injury is purely economic, the place of injury usually is where the plaintiff resides and sustains the economic impact of the loss" (Global Fin. Corp., 93 NY2d at 529). Defendants assert that this rule provides predictability and

---

[3] The parties agree that plaintiff's actions are timely if New York's six-year limitations period applies because they also agree that the six-year limitations period began to run on the closing date of each transaction. We have no occasion to address the dissent's theory that, contrary to the view of all parties to this appeal, the moment of accrual under New York law was the signing of the MLPAs, rather than the closing date of the transactions. As the dissent acknowledges, that theory was never raised on this appeal, and the parties have had no opportunity to address it. Litigants "expect us to decide their appeals on rationales advanced by the parties, not arguments their adversaries never made" (Misicki v Caradonna, 12 NY3d 511, 519 [2009]).

Contrary to the dissent's assertion, we are not overruling our RMBS precedent *sub silentio* by deciding this appeal on the arguments the parties have raised. In ACE, the MLPA and the PSA were executed on the same date, which was also the "closing date," and the representations and warranties were made "as of the Closing date" (ACE, 25 NY3d at 590). In Nomura, the timeliness of the actions was not at issue on the appeal to this Court (see Nomura, 30 NY3d at 580-581). And in Flagstar, the representations and warranties were made as of the closing date for each loan, and the parties agreed "that the closing date for each group of loans occurred between December 7, 2006 and May 31, 2007" (32 NY3d at 144). The defendant argued that the plaintiff's action was time-barred "because it was commenced more than six years after the closing date for the sale of each package of mortgage loans" (id.). We therefore did not consider in those cases the theory the dissent raises here, i.e., that the limitations period might begin to run on a date earlier than the closing date of the transactions.

uniformity, and that abandoning it here in favor of a factor-based analysis would result in confusion and uncertainty.

Plaintiff agrees that its causes of action accrued in the place where the economic injury was sustained, but it argues that the plaintiff-residence rule should not apply to determine where the injury occurred where, as here, the plaintiff is suing in merely a representative capacity. Instead, plaintiff argues, the Court should employ a multi-factor analysis to determine where the economic injury was felt, similar to the factor test employed in Maiden v Biehl (582 F Supp 1209, 1217-1218 [SD NY 1984]). Plaintiff contends that a factor test is a better fit for determining "who became poorer, and where . . . they bec[a]me poorer" (id. at 1218) when the plaintiff sues in a representative capacity.

In Maiden, the federal district court applied a multi-factor analysis to determine the place of accrual for purposes of CPLR 202 with respect to one of the plaintiffs' claims (see id. at 1217-1218). The court reasoned that "[w]here the plaintiff is a trust, the use of the residency of the trustee as the sole factor to determine the place of accrual does not make sense as a practical matter, and is not required legally" (id. at 1217). Instead, the court concluded that the economic injury was sustained in New York because that was where the trust was located. The court considered that taxes were paid in New York, the trust's investment decisions were made in New York, and the securities at issue in the case that formed part of the trust corpus were physically kept in New York (see id. at 1218).

Plaintiff asks us to apply a Maiden-like factor analysis here. Plaintiff argues, however, that the Appellate Division erred in the way it applied the Maiden test, and that the Court instead should have applied different factors than those used by the Maiden court

to determine the place of injury.  Plaintiff asserts that the Maiden court appropriately considered factors relevant to a small investment trust, but that different factors should be considered here because the trusts at issue are large, pass-through RMBS trusts.  To that end, plaintiff would have us focus on three factors: whether the trust documents contain a substantive choice-of-law provision, where the certificates are physically held, and where major decisions regarding the trusts were made.

We considered and rejected a similar argument in Global Fin. Corp.  There, the defendant retained the plaintiff to perform consulting services, and the plaintiff sued for breach of contract and quantum meruit when the defendant refused to pay the plaintiff's demanded fee (see 93 NY2d at 527).  The plaintiff eventually sued in New York, but both parties were Delaware corporations (see id.).  The defendant moved to dismiss the complaint as untimely, arguing that either the statute of limitations of Delaware (where the plaintiff was incorporated) or Pennsylvania (where the plaintiff had its principal place of business) applied (see id.).  The plaintiff argued that New York's longer limitations period should apply because the contract "was negotiated, executed, substantially performed and breached" in New York (id. at 528).

Describing the plaintiff's proposed approach as a "grouping of contacts" or a "center of gravity" analysis, we concluded that "these choice-of-law analyses are inapplicable to the question of statutory construction presented by CPLR 202" (id. at 528-529).  The Court noted that while we had not yet addressed the issue in a breach of contract case, we had consistently applied the rule that "a cause of action accrues at the time and in the place of the injury," and, in the case of an economic injury, "the place of injury usually is where the

plaintiff resides and sustains the economic impact of the loss" (id.). We observed that "CPLR 202 is designed to add clarity to the law and to provide the certainty of uniform application to litigants," and that "[t]his goal is better served by a rule requiring the single determination of a plaintiff's residence than by a rule dependent on a litany of events relevant to the center of gravity of a contract dispute" (id. at 530 [internal quotation marks omitted]).

Plaintiff is correct that in Global Fin. Corp., we did not foreclose the possibility that a test other than the plaintiff-residence rule may apply to determine where the economic injury was sustained. Instead, we stated that the place of economic injury "*usually* is where the plaintiff resides" (id. at 529 [emphasis added]). For that proposition, we cited, among other cases, Lang v Paine, Webber, Jackson & Curtis, Inc. (582 F Supp 1421 [SD NY 1984]), which applied a "financial base" rule to determine where the economic injury was sustained (see id. at 1425-1426; Global Fin. Corp., 93 NY2d at 530 [stating that in Lang, the plaintiff "intentionally maintained (a) separate financial base in Massachusetts" and under those circumstances, the "injury of losing Massachusetts funds was felt in Massachusetts, not Canada," where the plaintiff resided]). Here, we similarly do not foreclose the possibility that an economic loss may be sustained in a place other than where the plaintiff resides. Although in a breach of contract case, the place of injury will "usually" be where the plaintiff resides, that may not always be true (Global Fin. Corp., 93 NY2d at 529).

We nevertheless decline plaintiff's request to apply a multi-factor analysis to determine the place of accrual for purposes of CPLR 202. Plaintiff's proposed rule is

similar to the "center of gravity" or "grouping of contacts" approach proposed and rejected in Global Fin. Corp., and it illustrates the difficulty with a multi-factor analysis to determine the place of accrual: it would result in unpredictability and confusion.

Among the goals of CPLR 202 is the prevention of forum shopping and uniformity. As plaintiff acknowledges, however, a multi-factor test would require courts to apply different factors in different cases, and courts could afford different weight to the same factors based on different circumstances, possibly generating inconsistent outcomes. In addition to the prevention of forum shopping, another important purpose of CPLR 202 is "to add clarity to the law and to provide the certainty of uniform application to litigants" (Insurance Co. of N. Am. v ABB Power Generation, 91 NY2d 180, 187 [1997]). Just as that goal would not be served by a "center of gravity" analysis (see Global Fin. Corp., 93 NY2d at 530), it also would not be served by an amorphous factor analysis.

Furthermore, as noted above, plaintiff asks this Court to consider these factors: the parties' selection of New York substantive law,[4] the creation of the trusts pursuant to New York common law, the fact that the certificates were primarily held in New York, and that defendants and their affiliates made decisions about which mortgage loans to include in the pool in New York. Those factors may be relevant to where the contracts were "negotiated, executed, substantially performed and breached" (id. at 528), but they are irrelevant to where the alleged economic injury was sustained.

---

[4] It is undisputed on this appeal that the parties chose only New York's substantive law, and that they did not expressly state that New York's six-year limitations period would apply or otherwise use language clearly expressing their intent to preclude application of CPLR 202 (see generally 2138747 Ontario, Inc., 31 NY3d at 381).

We reaffirm that "a cause of action accrues at the time and in the place of the injury" (id. at 529). Although courts may, in appropriate cases, conclude that an economic loss was sustained in a place other than where the plaintiff resides, we decline to apply the multi-factor analysis that plaintiff proposes.

B.

We now turn to the issue of where the economic injury was sustained in this particular case. Our analysis is limited by the arguments the parties have raised.

All parties agreed below and continue to agree on this appeal that the residence of the certificateholders does not provide a "workable basis" for determining the place of economic injury, inasmuch as the certificateholders are geographically scattered (see 2015 NY Slip Op 32252[U], at *6, citing Maiden, 582 F Supp at 1218). In light of that agreement, we do not consider whether the residence of the certificateholders is an appropriate basis for determining the place of economic injury here, or whether the residence of trust beneficiaries may be relevant to the place of economic injury in a different case. Furthermore, although the certificateholders may have suffered concrete economic injury due to defendants' alleged breaches, here plaintiff is suing solely in its capacity as the trustee on behalf of the trusts for alleged breach of contract, and the parties agree that certificateholders may have their own, separate claims. Plaintiff also does not argue that the location of the trust property should determine the place of economic injury.[5]

---

[5] As the Appellate Division noted (see 156 AD3d at 403 nn 3, 4), the agreements contemplate the payment of state taxes, if any, in California, and the mortgage notes are physically maintained in California in the Barclays action and in Minnesota in the HSBC action.

For these reasons, we conclude that plaintiff's residence applies to determine the place of injury in this case. As trustee, plaintiff is authorized to enforce, on behalf of the certificateholders, the representations and warranties in the relevant agreements. Accordingly, it is appropriate for us to look to plaintiff's residence as the place where the economic injury was sustained and, consequently, where plaintiff's causes of action accrued for purposes of CPLR 202. Application of the plaintiff-residence rule here supports CPLR 202's goal of predictability and "certainty of uniform application to litigants" (Global Fin. Corp., 93 NY2d at 530 [internal quotation marks omitted]). That is especially true when we consider that these are representative actions commenced by a trustee for the benefit of numerous, geographically-dispersed beneficiaries.

Plaintiff is a resident of California. To satisfy CPLR 202, plaintiff's actions therefore must be timely under California's statute of limitations.

III.

As a general rule, when "borrowing" a foreign jurisdiction's statute of limitations under CPLR 202, we import that jurisdiction's limitations period, along with the "extensions and tolls applied in the foreign state . . . so that the *entire* foreign statute of limitations . . . applie[s], and not merely its period" (Matter of Smith Barney, Harris Upham & Co. v Luckie, 85 NY2d 193, 207 [1995] [internal quotation marks and citation omitted]; see also Norex Petroleum Ltd. v Blavatnik, 23 NY3d 665, 676 [2014]; Antone v General Motors Corp., Buick Motor Div., 64 NY2d 20, 30-31 [1984]). Put another way, CPLR 202 calls for a comparison of New York's "net" limitations period, integrating all relevant New York extensions and tolls, and the foreign state's "net" limitations period, with all foreign

tolls and extensions integrated, and if the foreign limitations period is shorter, the foreign net period determines the timeliness of the action (see Norex Petroleum Ltd., 23 NY3d at 676-677, citing Siegel, NY Prac § 57 at 82 [5th ed 2011]). California has a four-year limitations period for breach of contract actions (see Cal Civ Proc Code § 337).

Plaintiff contends, however, that its actions are timely even if California's four-year limitations period applies for three reasons, the first two of which rely on the meaning of terms in the parties' contracts. First, plaintiff argues that California law, unlike New York law, will enforce pre-accrual written agreements to extend the statute of limitations, and that the parties entered into such an agreement in the Barclays action (see Cal Civ Proc Code § 360.5; cf. Flagstar, 32 NY3d at 150-153). Second, plaintiff contends that California law does not recognize a distinction between substantive and procedural conditions precedent (cf. ACE, 25 NY3d at 597-598), and under California law, the limitations period did not begin to run until plaintiff demanded that defendants comply with the cure or repurchase protocol and defendants refused. Third, plaintiff argues that accrual of its claims was delayed by California's "discovery rule."

With respect to plaintiff's first two arguments, to the extent plaintiff relies on certain terms in the contracts to support its arguments that the actions were timely in California, plaintiff asks us to apply California common law to interpret the agreements. In the relevant contracts, however, the parties included a New York substantive choice-of-law provision, making it clear that contractual language is to be interpreted pursuant to New York law. It is a " 'fundamental, neutral precept of contract interpretation . . . that agreements are construed in accord with the parties' intent,' and '[t]he best evidence of

what parties to a written agreement intend is what they say in their writing' " (2138747 Ontario, Inc., 31 NY3d at 377, quoting Greenfield v Philles Records, 98 NY2d 562, 569 [2002]).  In adherence to that fundamental principle, we generally enforce choice-of-law clauses (see e.g. Ministers & Missionaries Benefit Bd. v Snow, 26 NY3d 466, 470 [2015]; IRB-Brasil Resseguros, S.A. v Inepar Invs., S.A., 20 NY3d 310, 315 [2012]).  We are therefore bound to interpret the contract provisions according to New York's substantive law.

Choice-of-law provisions are intended to guarantee a uniform interpretation of contractual language. Reviewing substantially the same contract terms in other RMBS cases, we have concluded that the provisions on which plaintiff now relies do not functionally extend the date upon which the limitations period begins to run (see ACE, 25 NY3d at 597-598; Flagstar, 32 NY3d at 150-153).  Were we to reach a contrary conclusion applying California law (as plaintiff now urges us to do), we would contravene the parties' clearly expressed intent that New York law govern the construction and interpretation of their agreements, an approach incompatible with our precedent.

In any event, plaintiff's arguments are unavailing even under California law. In both New York and California, a breach of contract cause of action generally accrues upon the breach (see e.g. El Pollo Loco, Inc. v Hashim, 316 F3d 1032, 1039 [9th Cir 2003]; Menefee v Ostawari, 228 Cal App 3d 239, 246, 278 Cal Rptr 805, 809 [1991]; April Enters., Inc. v KTTV, 147 Cal App 3d 805, 832, 195 Cal Rptr 421, 436 [1983]; see also Mary Pickford Co. v Bayly Bros., 12 Cal 2d 501, 521, 86 P2d 102, 111-112 [1939]).  The Appellate Division properly concluded that none of the relevant agreements "expressly

waive or extend the statute of limitations" (156 AD3d at 404).  In addition, under California law, plaintiff's demand that defendants comply with the cure or repurchase protocol did not delay accrual because plaintiff could have made that demand at any time after closing (see Taketa v State Bd. of Equalization, 104 Cal App 2d 455, 460, 231 P2d 873, 875 [1951]).[6]  Moreover, California law requires a demand to be made within a reasonable time, which is generally considered to be "at least within the statutory period of limitations" (Meherin v San Francisco Produce Exch., 117 Cal 215, 217, 48 P 1074, 1075 [1897]; see Stafford v Oil Tool Corp., 133 Cal App 2d 763, 765-766, 284 P2d 937, 939 [1955]).  Here, plaintiff did not demand that defendants comply with the cure or repurchase protocol until more than four years after closing.

With respect to plaintiff's third argument regarding California's discovery rule, we agree with the Appellate Division that the requirements for application of that rule were not met, "inasmuch as the record establishes that plaintiff reasonably could have discovered the alleged breaches within the limitation period" (156 AD3d at 404).  In other words, the discovery rule is inapplicable because plaintiff "knew or should have known of the wrongful conduct at issue" more than four years before plaintiff commenced these actions in 2013 (April Enters., 147 Cal App 3d at 832).

IV.

The 2007 to 2009 financial crisis was the worst recession since the Great

---

[6] Plaintiff's assertion that it did not unreasonably delay in making its demand because it could not have known earlier that the mortgage loans were defective is better addressed to plaintiff's argument about California's discovery rule.

Depression.  Approximately 8.8 million jobs and $19.2 trillion in household wealth were lost.[7]  That financial crisis has generated an almost endless array of legal issues in its wake. Many flow from disputes centered in contract law.

Here we are called on to, once again, determine the timeliness of RMBS litigation related to that financial crisis.  Despite the enormity of the financial stakes, we continue to approach these cases in a manner that emphasizes the importance of clear and balanced rules to guide our jurisprudence in the area of contract law.  We reaffirm the importance of predictability and uniformity in both contract law and the interpretation of CPLR 202.

Accordingly, the order of the Appellate Division should be affirmed, with costs.

---

[7] See U.S. Dept. of Treasury, The Financial Crisis Response in Charts, April 2012, available at https://www.treasury.gov/resource-center/data-chart-center/Documents/20120413_FinancialCrisisResponse.pdf (last accessed November 15, 2019).

Deutsche Bank Natl. Trust Co. v Barclays Bank PLC; Deutsche Bank Natl. Trust Co. v HSBC Bank USA

No. 84

WILSON, J. (dissenting):

Asserting that "[o]ur analysis is limited by the arguments the parties have raised" (majority op at 11), the majority offers a lengthy advisory opinion. Whether breaches of contractual obligations made to a trust accrue under the laws of the state where the trust

was formed, where the beneficiaries are located, or where the trustee is domiciled, is an interesting, unresolved question. But this case does not present that question, even if the parties have argued it. Deutsche Bank, in its capacity as trustee of the two trusts at issue, was not a party to either of the allegedly breached contracts. Rather, it was subsequently granted the right to recover for those breaches by an assignment. As any outline for a 1L contracts exam can attest, in an assignment, "the assignee acquires a right against the obligor only to the extent that the obligor is under a duty to the assignor" (Restatement [Second] of Contracts § 336[1] [emphasis added]; see also Muller v Kling, 209 NY 239, 243 [1913] [an assignee "stands in the shoes of (assignor); with no greater rights, as against the plaintiffs, than his assignors possessed"]). Assigning the right to pursue a remedy for a breach has no effect on the accrual of the breach itself.

The majority's opinion answers the question, "What if Barclays and HSBC had made representations directly to trusts of which Deutsche Bank was trustee and breached those representations?" But that "what if" is not present here – not on the complaint and not in the contracts governing the transactions at issue. Barclays and HSBC never made any representations to the trusts, and thus they never breached any representations to the trusts. Why would we permit parties to obtain a decision from this Court by presenting an argument that has no basis whatsoever in the complaints or contracts?

In a breach of contract claim, it is imperative to identify what contract has been breached, who made what promises to whom in that contract, and when the contract was

breached.  The majority elides all of those details and, as a result, fails to recognize that our precedents are dispositive here.

The relevant breached contracts in these actions were Mortgage Loan Purchase Agreements (MLPAs).  In the Barclays action, the parties to the allegedly breached MLPA were Sutton Funding LLC and Securitized Asset Backed Receivables LLC ("SABR").[1]  In that MLPA, Sutton Funding made representations and warranties to SABR.  In the HSBC action, the parties to the allegedly breached MLPA were HSBC and HSI Asset Securitization Corporation ("HSI").  In that MLPA, HSBC made representations and warranties to HSI.  All four of the contracting parties to the allegedly breached agreements are New York entities domiciled in New York.  When a New York domiciliary breaches a contract and thereby injures another New York domiciliary, the claim accrues in New York.  Such is the case before us.

It is wholly irrelevant to the injury analysis that SABR and HSI subsequently assigned to trusts, of which Deutsche Bank was trustee, their rights to recover for breaches of the MLPAs.  A breach of representations and warranties contained in a contract occurs at the moment the contract is executed, and we have held repeatedly that in the case of Residential Mortgage Backed Securities (RMBS), the breach occurs, "the moment the MLPA [is] executed" (ACE Sec. Corp., Home Equity Loan Trust, Series 2006-SL2 v DB

---

[1] For ease of reference, I refer to Barclays' "Representation Agreement" as its MLPA because it functions in the same role.  It sets out the representations and warranties to which the mortgages are claimed to conform, coupled with two "Assignment Agreements" by which the subject mortgages passed from Sutton to SABR.

Structured Prods., Inc., 25 NY3d 581, 598 [2015]; see also Nomura Home Equity Loan, Inc., Series 2006-FM2 v Nomura Credit & Capital, Inc., 30 NY3d 572, 580 [2017]; Deutsche Bank Natl. Trust Co. v Flagstar Capital Mkts., 32 NY3d 139, 146-47 [2018]).

The majority does not engage with the particulars of which contracts were breached because the parties did not raise it. In so holding, the majority is either issuing an unlawful advisory opinion or it is *sub silentio* overruling our recent decisions in <u>ACE</u>, <u>Nomura</u>, and <u>Flagstar</u>. As much as I would like to see the latter, neither result is tenable. When two New York parties execute a contract, the economic injury from breach occurs in New York, regardless of whether one party subsequently assigned its interest in the contract to a party domiciled elsewhere.

The majority's decision to resolve an issue not present in Deutsche Bank's complaints or in the MLPAs on which those complaints are based is particularly disturbing in light of the fact that there are approximately 50 other RMBS cases presently pending in the Manhattan Commercial Division before Justice Friedman. We advertise our role as focused on determining the law of the state to provide guidance to lower courts, litigants and contracting parties. Yet here the majority decides an issue not present on the face of the complaints or these contracts, and hence likely irrelevant to the bulk of pending RMBS cases.

In Part I, I explain why, on the complaints and contracts at issue, and under our recent RMBS precedents, the relevant facts for determining the applicable statute of limitations are the domiciles of the parties to the allegedly breached MLPAs, not the

domiciles of the trusts or trustee.  Here, New York's six-year statute applies; CLPR 202's borrowing provision is not implicated.  In Part II, I set out why – even were we to pretend that the claims here were of representations directly made to the trusts rather than assignments obtained by the trusts – I nevertheless disagree with the majority's advisory opinion.  The gravamen of accrual is where injury is sustained.  A trustee, who by definition holds only bare legal title without equitable interest, is not injured by a diminished trust corpus.  The certificateholders bear the injury, but because they are too geographically diffuse to provide any workable rule – as our precedent requires – I would hold that the trust itself, as an entity, sustained the injury.  Here, the trusts were clearly established by the parties as New York entities and thus their injury was sustained in New York.

## I.

To analyze Deutsche Bank's claims properly, we need to understand the various contracts and entities with greater detail than the majority provides.  At the height of the boom, just before the 2008 collapse, Barclays and HSBC each purchased mortgages originated by New Century Financial Corporation.  As to Barclays, it combined the New Century mortgages with mortgages originated by Ameriquest, both purchased and then held by a subsidiary called Sutton Funding LLC ("Sutton").  On April 12, 2007, Sutton assigned the mortgages to another Barclays entity, SABR.  Along with the assignment, Barclays and SABR executed a Representation Agreement, where Barclays made representations and warranties, to SABR, as to the quality of the loans that SABR was receiving.  Barclays, Sutton, and SABR are all New York domiciliaries.

As to HSBC, it also sold its bundle of New Century mortgages to a subsidiary, HSI, via an MLPA on May 1, 2007, and similarly made representations and warranties to HSI about the loans.  The parties to that MLPA are HSBC and HSI, both New York domiciliaries.  The representations and warranties in both MLPAs are standard for RMBS transactions.  For example, Barclays represented to SABR (and HSBC represented to HSI) that the payments on the underlying mortgages were not delinquent, that the mortgaged properties carried hazard insurance, that no mechanics liens on the underlying properties existed, and that no predatory or deceptive lending practices had been used in originating the mortgages.

After SABR and HSI acquired the mortgages and obtained the litany of representations and warranties from Barclays and HSBC, respectively, SABR and HSI placed the mortgages in trusts—for SABR, Securitized Asset Backed Receivables LLC Trust 2007-BR1 ("BR1"); for HSI, HSI Asset Securitization Corporation Trust 2007-NC1 ("NC1")—with Deutsche Bank National Trust Company ("Deutsche Bank"), a California domiciliary, serving as Trustee, pursuant to Pooling and Service Agreements ("PSAs").  BR1 and NC1 each was described in the PSAs as a trust formed under New York law.  The trusts closed on April 12 and June 5, 2007, respectively.  In their PSAs, depositors SABR and HSI transferred to trustee Deutsche Bank, on behalf of the two trusts, the right to sue for breach of representations and warranties in the underlying MLPAs (see BR1 PSA, §§ 2.01, 2.08); NC1 PSA, §§ 2.01(a); 2.03(d)).  Barclays and HSBC marketed certificates in

the trusts entitling the certificate owners to principal and interest distributions as borrowers made payments on the mortgages underlying the securities.

After the market plunged, certificateholders in the two trusts undertook forensic examinations of the underlying mortgages and discovered that many of them did not conform to the representations and warranties made by Barclays and HSBC in their respective MLPAs. They notified Deutsche Bank which then demanded—under the repurchase protocols of the MLPAs, as those rights were assigned through the PSAs—that Barclays and HSBC cure or repurchase the non-conforming loans. When Barclays and HSBC failed to cure or repurchase the non-conforming loans, Deutsche Bank, solely in its capacity as trustee and on behalf of the trusts, commenced actions on April 12, 2013, against Barclays and on June 5, 2013, against HSBC, precisely six years after the trusts closed.

## A.

The majority's analysis conflates the relevant MLPAs with the subsequent PSAs. In the former, Barclays made representations and warranties to SABR, and HSBC made them to HSI. Those terms were allegedly breached, which form the subject of the instant appeals. In the latter, SABR and HSI assigned to trusts, of which Deutsche Bank is the trustee, the right to sue for those breaches.

On a CPLR 3211 motion to dismiss, we look only to the pleadings, and dismissal is warranted only if the documentary evidence submitted therewith conclusively establishes, looking to the four corners of those documents, a defense to the asserted claims as a matter

of law (see Ellington v EMI Music, Inc, 24 NY3d 239, 249 [2014], quoting Leon v Martinez, 84 NY2d 83, 87 [1994] [quotation marks omitted]).  The operative complaints state clearly that the alleged breaches are to representations and warranties made in the MLPAs—not the PSAs.  The MLPAs are obligations made by New York domiciliaries to New York domiciliaries, and breaches thereof can only accrue, therefore, in New York.

Notably, the instant actions were brought against Barclays and HSBC—neither of which is a party to a PSA—by Deutsche Bank, which is not a party to either MLPA.  The defendants here, Barclays and HSBC, could not be sued for breaches of the PSAs because they are not parties to the PSAs.  Deutsche Bank's causes of action lie against Barclays and HSBC only because, through the PSAs, Deutsche Bank acquired the rights of SABR and HSI to sue for breaches of representations and warranties made by Barclays and HSBC in their MLPAs (see Barclays Complaint, ¶¶ 11-13, 36-41; HSBC Complaint, ¶¶ 11-13, 26, 31-34).  The PSAs assigned rights created when the representations and warranties as to the quality of the loans were made in the MLPAs; the PSAs did not create any new representations or warranties as to the characteristics of the underlying mortgages.

The contracts make sense in the context of the instant appeal only if we understand Deutsche Bank to be asserting rights that have been assigned to it by SABR and HSI, which is exactly how the contracts define the relationships.  Each PSA defined its associated "Trust Fund" as including "[SABR's] rights under the Barclays Representation Agreement and the Assignment Agreements . . ." for BR1; and "[HSI's] rights under the [Mortgage

Loan] Purchase Agreement, the Master MLPISA and each Servicing Agreement . . ." for NC1.

The majority fails to distinguish between the MLPAs and the PSAs. Instead, it analyzes the claims as if Barclays and HSBC made representations and warranties directly to the trusts—with Deutsche Bank as trustee—on the day that the BR1 and NC1 trusts closed (majority op at 2-3). That interpretation is a fantasy, resting not on the complaint or the contracts, but on the parties' say-so. There are no obligations flowing from Barclays and HSBC to the trusts. There are only obligations from Barclays to SABR, and from HSBC to HSI; there are assignments from SABR and HSI to the trusts. The majority's opinion may be responsive to arguments made by the parties, but it is based on fictional contracts and pleadings, not the record on appeal.[2] That determination offends our ban on

_____

[2] The majority's footnote three (majority op at 6, n 3), reduced to its essence, says that we must decide contractual disputes based solely on the arguments advanced by the parties, even if those arguments are wholly untethered from the contracts and pleadings. That is, if Deutsche Bank relied on these very pleadings and contracts to claim that Barclays and HSBC had delivered unicorns lacking promised magical properties, and Barclays and HSBC defended solely on the ground of impossibility, we would be powerless to say that the RMBS agreements have nothing to do with unicorns. Although I appreciate that the parties' choice of argument is important, our self-proclaimed purpose is to decide issues— not arguments—of statewide importance, not merely the disputes of the parties (see Persky v Bank of American Natl. Assn., 261 NY 212 [1933], citing Oneida Bank v Ontario Bank, 21 NY 490, 504 [1860] ["In our review we are confined to the questions raised or argued at the trial but not to the arguments there presented"] [emphasis in original]). Where parties have ignored the text of their pleadings and contracts, and foisted on us some argument or issue not present therein, we have a duty not to decide feigned, collusive or hypothetical questions (cf. New York Public Interest Research Group, Inc. v Carey, 42 NY2d 527 [1977]). Without going into detail, suffice it to say that the shifting arguments made by the parties in this and other RMBS litigation are largely a result of two factors: first, the unanticipated rulings of courts, including ours, which have led parties such as these to advance creative arguments not on their minds when they entered their contracts; and

advisory opinions because our power "only arises out of, and is limited to, determining the rights of persons which are actually controverted in a particular case pending before the tribunal", a principle which "forbids courts to pass on academic, hypothetical, moot, or otherwise abstract questions" (Hearst Corp. v Clyne, 50 NY2d 707, 713 [1980]).  Because Deutsche Bank is standing in the shoes of SABR and HSI, two New York entities, the injuries upon which the claims are built were sustained within the state.  CPLR  202— which applies to "cause[s] of action accruing without the state"—is not implicated.

B.

The only way to construe the majority's opinion as non-advisory would be to hold that when SABR and HSI put the New Century mortgages into trust, there was a new breach of the representations and warranties made by Barclays and HSBC in the MLPAs where SABR and HSI acquired the loans.  Putting aside that no basis is offered for that unusual idea, such a holding would directly contradict our recent holdings in indistinguishable circumstances.  In ACE and Flagstar we held that on a claim for breach of representations and warranties for contracts that grouped residential mortgages into securities to market to investors, the injury occurred "the moment the MLPA was executed" (ACE, 25 NY3d at 598) because "[the depositor] was obligated to deliver loans that complied with the representations and warranties at the moment the [MLPA] was executed" (Flagstar, 32 NY3d at 148).  The breach is not ongoing, and it does not re-occur

---

second, the fact that many of the parties involved in these RMBS transactions wore a depositor's hat in one, an issuer's hat in another, and a trustee's hat in a third.

when a party initiates its contractual remedies for the breach, even if repurchase or replacement on demand are the exclusive remedies under the contract (see Nomura, 30 NY3d at 584).

Those holdings map precisely to the case at bar. Barclays and HSBC breached their obligations, if it all, when they executed the MLPAs and transferred nonconforming loans to SABR and HSI. The statute-of-limitations clock on those breaches started running at that moment. In subsequent PSAs, depositors SABR and HSI assigned the rights to pursue remedies for those breaches, but that is immaterial to the questions of when the breach occurred (the moment the MLPA was executed) and who was injured by it (SABR and HSI, who received mortgages that did not comply with the warranties and representations made to them). Because Deutsche Bank, in its capacity as trustee, was not a party to either MLPA, but merely a later assignee of rights held by SABR and HSI, neither the trusts' domicile nor Deutsche Bank's domicile is relevant to determining the accrual of the breach. Holding that a subsequent assignment to another party alters the accrual of a cause of action would cause statutes of limitations to shift each time a right to sue for a prior breach was assigned. That is not the law of this (or any) state, and would enable and encourage the forum shopping CPLR 202 was aimed to curtail.

Deutsche Bank's action against HSBC provides the clearest illustration of why that cannot be correct. The MLPA between HSBC and HSI was executed on May 1, 2007. On May 2, 2007 and for the next six years, according to ACE, HSI had a cause of action against HSBC for breach of contract because the loans it purchased did not conform to the

representations and warranties in the MLPA.  Then, on June 5, 2007, HSI put those loans into trust with Deutsche Bank as trustee and assigned to the trust all its rights to recover under the MLPA.  According to the majority, even though no new representations and warranties were made, and even though Deutsche Bank's cause of action as pled came from the May 1 MLPA, on June 5 the clock re-started—but this time for only four years, rather than six, because the trustee was located in California.  Because the assignment itself cannot alter the underlying rights, it must be that breach of the PSA constituted a new and separate breach from the MLPA, but that upends the holdings of <u>ACE</u>, <u>Nomura</u>, and <u>Flagstar</u>.

If we hold that there were new breaches upon execution of the PSAs, then we are reversing our precedents and creating significant uncertainty.  Essentially, we would give contracting parties the power to change the nature of their rights against a counterparty by assigning those rights to a foreign third party.  We should not overrule ourselves *sub silentio*, and certainly not to promote forum shopping and uncertainty.  The simplest solution is best: follow our precedent to hold that the relevant breach was to the MLPAs, two contracts between New York parties, and thus injury for the breaches occurred in New York.  As such, there is no need to wade into the novel question of how to treat the trustee of an investment vehicle business trust for CPLR  202 purposes.  That question was never considered by or relevant to the parties when these contracts were made and is not properly before us now.

C.

Consistent with that analysis, I would hold that Deutsche Bank's claim against Barclays is timely but its claim against HSBC is not. The action against Barclays was brought on April 12, 2013, which was six years to the day of execution of the MLPA. It is therefore timely under New York law. However, the HSBC MLPA was executed on May 1, 2007. Per the PSA, the trust the parties created then closed on June 5, 2007. The action was brought on June 5, 2013, six years from the closing of the trust, but six years plus one month after the execution of the MLPA. It is therefore time-barred. Under the framework I have outlined above, that makes sense, because during the period from May 1, 2007, to June 5, 2007, HSI had the right to sue for misrepresentations made by HSBC in the loans it acquired; the subsequent transfer of those rights to the trust did not restart the statute of limitations against HSBC, which was not a party to the PSA.

II.

Ignoring the complaint and contracts, and instead cabining itself to a baseless issue argued by the parties, the majority hypothesizes as to what rule of accrual should obtain if representations and warranties made directly to a trust are breached. Loathe as I am to address that hypothetical question, I disagree with the majority's analysis, and therefore set out my reasoning for rejecting it. In brief, I would still hold that the claims accrued in New York because, where the general rule that a claim for economic injury accrues where the injury is felt cannot be applied because the economic injury is geographically diffuse,

a rule that a cause of action accrues under the law of the state in which a trust is formed is superior to a rule based on the domicile of a trustee.

I agree with the majority that we do not – and should not – engage in factor-weighing to determine the location of an injury. As <u>Global Financial</u> holds, to give certainty to contracting parties, we require a rule of single determination. The gravamen of accrual is where injury was sustained (<u>Global Fin. Corp. v Triarc Corp.</u>, 93 NY2d 525, 529 [1999] ["a cause of action accrues at the time and in the place of the injury"]). And "[w]hen an alleged injury is purely economic, the place of injury usually is where the plaintiff resides and sustains the economic impact of the loss" (<u>id.</u>). The question for the court is "who became poorer, and where did they become poorer" (<u>Maiden v Biehl</u>, 582 F Supp 1209, 1218 [SD NY 1984], citing <u>Arneil v Ramsey</u>, 550 F2d 774, 779 [2d Cir 1977]). For accrual purposes, when a trustee brings a suit on behalf of a trust, we could hold that the injury is suffered (i) by the trustee itself, (ii) by the trust itself, or (iii) by the beneficiaries of the trust themselves—our precedent is silent on that issue.

The division of the trust into a legal interest held by the trustee and an equitable interest held by the beneficiaries reflects the fundamental view that a trustee has no economic interest whatsoever in the trust corpus and, indeed, is liable both civilly and criminally for misuse of the trust corpus for the trustee's own benefit (<u>see</u> Restatement [Third] of Trusts § 2, cmt d [Am. Law Inst. 2003]; <u>Toronto General Trust Co. v Chicago, Burlington & Quincy R.R. Co.</u>, 123 NY 37 [1890]; <u>In re Straut's Estate</u>, 81 Sickels 201, 211 [1891]). All the economic interest in the trust corpus rests with the beneficiaries. Thus,

a trustee by definition does not feel the impact of a trust's economic loss, because it holds no equitable stake. The loss is borne by the equitable owners. Barclays and HSBC do not dispute that the economic injury here is borne by the certificateholders, not the trustee. Their argument favoring selection of the domicile of the trustee begins not with any claim that the trustee is injured, but that the beneficiaries are scattered. That is, Barclays' and HSBC's argument does not follow from Global Financial's recognition that a purely economic cause of action occurs where the loss is felt, but instead from a view as to what to do when the location of the economic injury cannot provide a rule of decision for the place of accrual.

Even Global Financial, in the text relied upon by Barclays and HSBC and quoted by the majority, held that economic injury is "usually where the plaintiff" resides (Global Fin. Corp., 93 NY2d at 529; majority op at 9 [emphasis added by majority]). Of course, parties authorized to bring suit for an injury someone else suffered are the exception, not the rule. Trustees, like legal guardians or conservators, are statutorily granted the right to act as litigants for injuries that they do not suffer (see CPLR 1004). The cases upon which Global Financial grounded the "usual" rule are usual cases in which the plaintiffs were natural persons or corporations, suing on their own behalf, whose legal and equitable title were not separated, and whose location of injury was indisputably their place of residence (see Matter of Smith Barney, Harris Upham & Co. v Luckie, 85 NY2d 193, 207 [1995]; Dymm v Cahill, 730 F Supp. 1245 [SD NY 1990]; Arneil, 550 F2d at 779; Sack v Low, 478 F2d 360, 365 [2d Cir 1973] ["when a person sustains loss by fraud, the place of wrong

is where the loss is sustained, not where fraudulent representations are made . . . While we have found no New York decision directly in point, we believe that the New York courts would follow this traditional approach"] [internal quotations omitted]).

I therefore do not agree with the premise that we must choose between the bright-line rule of Global Financial and the multi-factor test of Maiden. Maiden, which came 15 years before and in the federal district court, is not in tension with Global Financial except insofar as it said in dicta that "New York and federal courts [are] grappling with two different approaches [plaintiff-residence vs. center-of-gravity] to the question of how to decide where a cause of action accrued for the purposes of the borrowing statute" (Maiden, 582 F Supp at 1212). Global Financial answered that question by rejecting center-of-gravity and choosing place of the economic injury.[3] Maiden's holding was that "the Trust itself . . . suffered the loss" and thus the question for the court was where the trust felt the loss.[4] Because Maiden held that the trust, not the trustee, suffered the economic injury, its holding is in harmony with Global Financial—it based accrual on the location where the economic injury was felt.

---

[3] The majority leaves open the possibility in some cases "that a test other than the plaintiff-residence rule may apply to determine where the economic injury was sustained" (majority op at 9), presumably because there could be cases where the plaintiff's residence is not the site of economic injury. In my view, such a case is before us.

[4] The majority refers to "the Maiden test" as a defined set of factors to which a court should look in determining the site of injury (majority op at 7). The holding of Maiden is not that certain factors are dispositive of where a trust resides. Rather, the Maiden court held that injury in that case was felt by the trust itself, as an entity, and then it looked to certain factors to determine where the trust, as an entity, suffered that injury.

Trusts divide ownership between beneficiaries, who hold equitable title, and the trustee who holds "bare" legal title (see Restatement [Third] of Trusts § 2, cmt d). Deutsche Bank, as trustee, had duties to accept delivery of the mortgages on behalf of the trusts and for the "exclusive use and benefit of" the certificateholders (BR1 PSA § 2.02; accord NC1 PSA § 2.01(a)). It also had the power to enforce the rights of the trust on the trust's behalf (BR1 PSA § 2.08; NC1 PSA § 8.01). In return, Deutsche Bank collected a fee (BR1 PSA § 8.05; NC1 PSA § 8.05). By definition, the trustee is not injured by the diminishment of the trust corpus, because the trustee's role is to maintain the trust for the exclusive benefit of the certificateholders who retain the beneficial interest.

The recognition in law that a trustee holds "bare" or "legal" title to the trust corpus is shorthand for a fiction by which the law separates the holding of title from the enjoyment of gain or the injury of loss. To say the trustee suffered the injury would be a fiction directly at odds with centuries of trust law (see John Morley, The Common Law Corporation: The Power of the Trust in Anglo-American Business History, 116 Colum L Rev 2145 [2016]). Because a rule based on the location of certificateholders would be unworkable, and a rule based on the location of the trustee would be at odds with the law and reality of the role of the trustee, the most sensible rule is to treat the trust itself as the relevant injured entity.

It is clear on this record that BR1 and NC1 are New York entities. According to the Restatement, a trust is "a fiduciary relationship with respect to property, arising from a manifestation to create that relationship" (Restatement [Third] of Trusts § 2). The

relationships codified in those trusts were created via the manifestations of contracts. In the BR1 PSA, it says clearly that SABR "does hereby establish, pursuant to the further provisions of this Agreement and the laws of the state of New York, an express trust" (BR1 PSA § 2.01[c]). The NC1 PSA says the same (NC1 PSA § 2.01[c]). The contractually-expressed intentions of the parties must count for something.

It is also relevant that these trusts are not the conventional sort of trusts, e.g., testamentary trusts or trusts for the benefit of a minor or disabled person, but are instead vehicles for securitization, with shares therein sold on the open market to sophisticated investors globally. "A familiar and eminently sensible proposition of law is that, when parties set down their agreement in a clear, complete document, their writing should as a rule be enforced according to its terms" (W.W.W. Assocs., Inc. v Giancontieri, 77 NY2d 157, 162 [1990]). Barclays and HSBC marketed shares of the trusts to investors, describing each entity as a "New York common law trust" (BR1 Prospectus Supplement, April 10, 2007, at S-43; see also NC1 Prospectus Supplement, June 4, 2007, at S-102). Hewing to the Restatement, the "manifestation" of the parties' intent was to create an entity in New York. I do not base that on the parties' choice of New York for substantive governing law, and I certainly do not base that on any of the various factors cited by the parties such as where underlying mortgages are held, where the properties encumbered by those mortgages are located, where state tax could have been paid, or where investment decisions were made. That is not how we determine accrual. I look only to the text of the contracts that expressly created the trusts under New York law, thereby locating them in in New

York.  That was the intention of the parties and the expectation of the investors who bought equitable interest in the trusts.

In addition to being closer to the economic reality of the injury, holding that the injury was borne by the trust rather than the trustee is a clearer, more workable rule.  Trusts can have multiple trustees, they can have corporate trustees with differing states of incorporation and principal places of business, and they can change trustees during the life of the trust, even as replacement loans are being swapped into the trust.  If the location of the trustee were determinative, the rule would be less consistent and less predictable than a rule based on the law under which the trust was created.  A breach of one set of representations could occur at a different time from another set of representations, and if the trustee changed (or went bankrupt, or restructured,) different claims concerning the same trust could be governed by different state laws, and no rule would exist for trusts with joint trustees with different domiciles.  But if the trust itself was formed under the laws of a particular place, the law is clear, stable and completely within the parties' prospective control and negotiation.

Some states, including Delaware and Massachusetts, have recognized the advantage of predictability with regards to trusts and allowed parties to register trusts as statutory entities with the Secretary of State (see Del Code § 3810; Mass Gen Laws Ann ch 182 § 2).  As the Restatement notes, "increasingly modern common-law and statutory concepts and terminology tacitly recognize the trust as a legal entity" (Restatement [Third] of Trusts § 2, cmt a).  That has been implicit in our RMBS cases, where we have written that "[t]he

Trust suffer[s] a legal wrong at the moment [the depositor] allegedly breach[es]" its representations (ACE, 25 NY3d at 597).

Still, our precedent and statutes are mostly silent as to the entity status of a trust in an injury analysis. The cases about trustees concern their role as a party in litigation and hold that we can adjudicate the rights of a trust fully through a trustee-plaintiff or trustee-defendant (see Toronto General Trust Co., 123 NY at 37 [holding that action by a trustee "is not brought [] in a representative capacity, but in [the trustee's] own right as the legal owner of the property"]). In that vein, CPLR 1004 dictates that trustees can sue or be sued without joining the equitable owners of the trust. For litigation purposes, that illustrates a sensible policy that is perfectly aligned with the concept of a trustee as holder of bare legal title. But injury is not about legal title, it is about equitable interest: the "impact" of loss (Global Fin. Corp., 93 NY2d at 530). Treating the trustee as the injured party is inconsistent with the economic reality, makes things less clear for litigants, and is not compelled by our precedent.

III.

To conclude, I reiterate that under our precedents, the relevant breaches in this appeal are to contracts between New York parties and therefore the claims accrued in New York. The only relevance of Deutsche Bank is that it was subsequently assigned the right to pursue remedies for those breaches on behalf of the trusts to which the claims were assigned. Holding that the breaches of the MLPAs alleged here—in contracts between only New York parties—have a place of accrual based on the domicile of a trustee of a

trust that was not a party to those MLPAs would be extraordinarily novel; our recent RMBS precedents expressly state that alleged breaches of an MLPA occur the moment the MLPA is executed. However, even if we were to accept the counterfactual proposition that Deutsche Bank's claims are rooted in breaches of representations made directly to the trusts, rather than injuries to SABR and HSI subsequently assigned to the trusts, I would hold that for accrual purposes, the law under which these trusts were created – not the domicile of the trustee – determines the rule of accrual for breach.

*   *   *   *   *   *   *   *   *   *   *   *   *   *   *   *   *

Order affirmed, with costs. Opinion by Judge Fahey. Chief Judge DiFiore and Judges Stein and Feinman concur. Judge Wilson dissents in an opinion in which Judge Rivera concurs. Judge Garcia took no part.

Decided November 25, 2019